ALBERT F. ROCKWELL vs. THE NEW DEPARTURE MANUFACTURING COMPANY.

[1] Third Judicial District, New Haven, June Term, 1924.

WHEELER, C. J., BEACH, CURTIS, KEELER and [2] KELLOGG, Js.

Prior to 1889 the plaintiff was a member of a partnership engaged in the manufacture of call or signal bells of various kinds, under his own patents. In June of that year he, with others, organized the defendant, which took over the business of the partnership, and under the management of the plaintiff—for years its moving spirit and guiding influence—the company was exceedingly prosperous. In 1903, it contracted with the plaintiff for the exclusive right to make, use and sell to others in this and foreign countries his inventions relating to brakes and coaster brakes, and for the transfer to it of all future inventions made by him while in its employ under the contract, with full information as to the manner of their construction and use; and in consideration thereof the company agreed to pay the plaintiff monthly a stipulated royalty or commission on its sales of coaster brakes, and with respect to subsequent inventions, to pay him a royalty of two per cent on the net sales exceeding $50,000 a year. The contract stipulated that the plaintiff was "to

---

[1] Transferred from first judicial district. See volume for June Term, 1924, third district, for record and briefs on the first argument; and volume for March Term, 1925, first district, for briefs on the second argument.

[2] Mr. Justice Kellogg died shortly after the opinion was filed, and on the reargument of the cause, Judge Hinman, of the Superior Court, sat in his stead.

remain in the employ of the Company and use his best efforts"
in its behalf so long as it might elect, and that he should
receive a yearly salary of $5,000 in addition to his royalties.
It also provided that "should the said Rockwell voluntarily
leave the employment of the Company for any other reason
than the nonpayment of his royalties and salary," all payments
of the latter should cease and determine, but the company's
rights to his inventions should continue; and that in the event
of his death his salary should cease, but the royalties should
continue to be paid to his representatives. In October, 1909,
by an amendment or supplementary contract, the plaintiff
agreed that the company should have the right to license other
persons or corporations than the three mentioned therein, to
manufacture and sell coaster brakes, and to sell the patents or
licenses, upon payment by the company to the plaintiff of ten
per cent of the gross receipts under such licenses or sales.
About 1906 the company began to manufacture ball bearings,
which proved profitable, but the company, through over-expan-
sion urged by the plaintiff, found itself in the fall of 1913
faced with pecuniary obligations amounting to between $500,000
and $1,000,000, and had nothing with which to meet them.
The policy of expansion led, in the latter part of 1913, to serious
disagreement between the plaintiff and the company's treasurer,
who was backed by the other directors. Thereupon, the plaintiff
failing in his proposal to buy their stock, the directors arranged
to secure additional funds through the issue of $500,000 worth
of new common stock. About this time the directors elected
the treasurer of the company as chairman of the board, a
newly-created office, and appointed a new general manager
whose powers included substantially all those which up to that
time had been held by the plaintiff; the latter continued in
office as president and as a director and was understood to be
the company's adviser in patent matters, but he had no duties
to perform and was shorn of all his executive authority, powers
and privileges. He was not permitted to attend, as thereto-
fore, the weekly meetings of the heads of the factory depart-
ments, nor was he consulted upon any matters affecting the
company, despite his repeated offers of help and assistance.
About September, 1914, a question was raised by the company
as to the plaintiff's right to commissions or royalties on sales
of single row ball bearings, and shortly thereafter the company
refused to make payments on such sales. In 1915 or 1916 the
plaintiff sought to secure some money on account from the com-
pany, but was informed that no payments would be made to
him unless he gave a receipt in full. No further payments
were actually made to the plaintiff, though he was credited

Rockwell *v.* New Departure Mfg. Co.

royalties on coaster brakes and double row bearings, commissions on foreign licenses, and his salary; but no credit was given him for royalties on single row bearings or for commissions on receipts from domestic licenses. While matters remained in substantially this situation, the plaintiff, on March 1st, 1917, made a contract with the Marlin-Rockwell Corporation, entered into its employ, and brought the present suit in which, among other things, he prayed for an accounting. From the interlocutory judgment therein each side appealed. *Held:*

1. That a determination of the principal question in the case—whether the plaintiff voluntarily left the employ of the defendant for any other reason than the nonpayment of his royalties and salary—involved a construction of the contract of 1903 as modified by the agreement of 1906.

2. That although this contract was in some respects inartifically drawn, yet its primary purpose on the part of the defendant was obvious: to secure for itself the plaintiff's inventive ability and all of his inventions during the life of the contract; and on the part of the plaintiff, to obtain a more adequate compensation as well as an opportunity to use his inventive and executive faculties so as to make them yield a larger return.

3. That the promise of the plaintiff "to use his best efforts in the interest of the Company," implied a corresponding obligation upon the part of the company to extend to him an opportunity to make use of its factory and its employees in his study and experiments—a practice which the company had followed for years, and without which the plaintiff's inventive genius could neither develop nor improve.

4. That the persistent, continuous refusal of the defendant to afford the plaintiff any opportunity whatever for the exercise of his inventive ability after his demotion and the instalment of the new management in 1914, constituted a breach of the contract, and justified the plaintiff in thereafter seeking and accepting employment elsewhere, although with a competitor; and that such severance of the relation was also justified by the defendant's refusal to pay the plaintiff what was admittedly his due, unless he gave the company a discharge in full.

5. That in view of the foregoing conclusions it became immaterial whether the voluntary retirement clause was or was not in the nature of a penalty and unenforceable, and whether the contract of 1903 was or was not severable.

6. That under the supplementary agreement the plaintiff was entitled to commissions on coaster brake royalties received from domestic, as well as foreign, licensees, other than the three specifically excepted; that this agreement was not made under a mutual mistake of the parties, nor was the statute of limita-

Rockwell *v*. New Departure Mfg. Co.

tions applicable to the situation so as to exclude from the account all items of an earlier date than six years prior to the commencement of the action, as contended by the defendant.

7. That the plaintiff was not entitled to recover commissions on single row ball bearings, since they were not "manufactures embodying" any of his inventions, though several patented machines or processes invented by him were used in making the balls contained in both double and single row bearings.

8. That the parties by their conduct with respect to the payment and receipt for several years of commissions on all bearings, without making any distinction between double and single row bearings, had not put such a practical construction upon the contract as to preclude the defendant from relying upon its legal interpretation in the present litigation; but that the defendant could not recover back the commissions which it had actually paid to the plaintiff on single row bearings, as money paid under a mistake, since the parties stood on an equal footing, the payments were voluntary, and were made in response to a claim advanced in good faith and within the limits of a possible construction of the contract.

9. That the plaintiff was entitled to an accounting to be taken up to the date of the judgment in the Superior Court, upon all patents subject to the payment of royalties, which were still in force.

It is a principle of general application in the construction of contracts, that whatever may be fairly implied from the language of the instrument is, in judgment of law, contained in it; and therefore a writing purporting to be a contract between its two signers, which upon its face and by its express terms appears to be obligatory upon one of them only, with respect to a particular matter therein, creates by implication a corresponding correlative obligation on the part of the other, if it is manifest that such was the intention of the parties.

The statute of limitations is not *stricti juris* a bar to an equitable action, though it is sometimes applied by analogy upon the principle of laches.

The word "account" has no clearly defined legal meaning. Items improperly omitted from an account by oversight of the parties will be treated by equity as though they actually appeared therein, and the rights of the parties will be determined accordingly.

To "embody" an invention in a manufactured article means primarily to incorporate, incarnate, or give concrete form to that invention in the article in question.

Money paid by one contracting party to the other under the terms of a written instrument and in part performance thereof, can-

Rockwell *v.* New Departure Mfg. Co.

not be recovered back as money paid under a mistake of law,
when the parties stand upon an equal footing as to their means
of knowledge of their respective obligations and the payments
are made in response to a claim advanced in good faith and
based upon a permissible, though erroneous, construction of the
instrument.

The case of *Northrop* v. *Graves,* 19 Conn. 548, approved but dis-
tinguished.

Argued June 10th, 1924; reargued March 10th, 1925—decided
March 25th, 1925.

SUIT for an accounting and a recovery of the amount
found due thereon, brought to the Superior Court in
Hartford County and tried to the court, *Maltbie, J.;*
interlocutory judgment rendered ordering an account-
ing and prescribing its terms and conditions, from
which each party appealed. *Error in part.*

The defendant was incorporated in 1889 by charter
from the General Assembly of Connecticut, with the
plaintiff as one of its incorporators; it took over the
business of a partnership of which plaintiff was a mem-
ber, engaged in Bristol in the manufacture of door-bells
bicycle-bells and call-bells under patents covering in-
ventions originated by plaintiff, and which manufac-
ture and business it continued. On October 28th, 1889,
defendant entered into an agreement with plaintiff by
which he was employed as a superintendent and in
making and perfecting inventions at $150 a month, and
which provided that after he should have left its em-
ploy he should transfer to defendant all inventions or
improvements in existing inventions pertaining in any
way to gongs or bells, or to machines to make or pro-
duce the same, and would do all things necessary to
secure patents upon such inventions, and would assign
the patents to the defendant. The plaintiff did assign
under this agreement existing patents to defendant,
and thereafter invented and patented divers inven-
tions which he similarly assigned. Plaintiff continued

in this employment until 1891 or 1892, when he left defendant's employ. After about three years he returned to its employ, by vote of the directors, as president in charge of the inventive, mechanical and manufacturing departments of the company, and continued in the active management of defendant until January 1st, 1914.

In 1898, plaintiff invented a back-pedaling brake, and in the same year one Townsend, working as a mechanic under the plaintiff's instruction and supervision, invented a coaster brake or hub, and assigned his rights thereto by agreement with plaintiff to defendant, and later applied for a patent which was not issued until 1907. The Townsend patent was not an invention of plaintiff and never belonged to him. In December, 1908, defendant, through plaintiff, made a license agreement with P. and F. Corbin Company to manufacture and sell this Townsend invention, to run for three years, with the right to renew for three more. Prior to December 6th, 1900, plaintiff, while general manager of defendant, invented coaster brake improvements to Townsend's invention, and also a lubricating device, and assigned these to defendant. The plaintiff and his wife owned from fifteen to seventeen per cent of the $50,000 capital stock of the defendant, of which $18,000 represented assets, and the rest good-will.

Ever since the organization of the defendant and down to July 1st, 1903, the plaintiff had been chief executive and general manager of defendant and its only director with manufacturing experience, had turned over to it his inventions of a patentable nature, and in many ways originated and carried out methods of production not in any sense patentable. The ability, executive and inventive, of the plaintiff, was the foundation upon which the business of the defendant and of its predecessor partnership had been built.

Rockwell *v.* New Departure Mfg. Co.

Plaintiff's salary was fixed in 1895 at $9,500 a year, but reduced because of poor business in 1898 to $5,000, and so continued on July 1st, 1903. In order to obtain more adequate compensation and to secure a greater pecuniary return for his inventive and executive ability, plaintiff instituted negotiations with the directors of defendant with a view to a readjustment of his compensation. The defendant was particularly desirous of retaining for itself plaintiff's services, especially his inventive ability. An agreement dated July 1st, 1903, was the result of these negotiations. It was drafted by an attorney named Anderson, a patent lawyer employed by defendant, whose employment had been brought about by plaintiff and who was on terms of intimacy with him. The attorney drafted the agreement under plaintiff's supervision and direction, who gave to the attorney its substance and all knowledge as to its details. Plaintiff's instructions to the attorney were not specific, the details were not gone into, but the purpose of the contract was stated. The attorney submitted a rough draft of the agreement to plaintiff, who approved it, substantially without change, and it was typed and approved by the directors and executed. The attorney acted for both parties, for the defendant through his employment, and for the plaintiff through courtesy and friendship. Plaintiff at this time had no great familiarity with patent law and its terms and phraseology. Neither the attorney nor plaintiff intended the language of the contract to carry an import not apparent on the surface more favorable to defendant than plaintiff. This agreement consists of eleven paragraphs which are set forth in the accompanying footnote.

LICENSE AGREEMENT

This agreement made this first day of July, 1903, by and between Albert F. Rockwell of Bristol, in the County of Hartford and State

After the execution of this agreement the salary paid plaintiff remained substantially at the $5,000 named

of Connecticut, party of the first part, and The New Departure Manufacturing Company, a corporation created and existing under and by virtue of the laws of the State of Connecticut, and located at Bristol in the county and state aforesaid, party of the second part, hereinafter called the Company:—

WITNESSETH: That whereas the said Albert F. Rockwell has invented certain new and useful improvements in driving and braking mechanism for cycles for which he has made application for the grant of Letters Patent of the United States, as follows, to wit:—

Application No. 39,700, filed December 13th, 1900, for Coaster Brakes;

Application No. 114,860, filed July 9th, 1902, for Driving and Brake Mechanism for Cycles; and

Application No. 126,259, filed October 6th, 1902, for Lubricating Device for Vehicle Hubs; all of which are applicable to, and designed to be embodied in, driving and braking devices for cycles, generally known as "Coaster Brakes"; and

WHEREAS, the said Albert F. Rockwell has invented and patented divers other inventions and improvements in bicycles, cyclometers, bells and other articles of manufacture, which patents have from time to time been issued to the Company as the assignee of said Albert F. Rockwell; and

WHEREAS, the Company is engaged in the manufacture and sale of devices embodying and containing the inventions of the said Albert F. Rockwell, as set forth in the patents which have been granted to the Company on application of the said Rockwell, as aforesaid, and also is engaged in the manufacture and sale of "Coaster Brakes" embodying the inventions or some of the inventions set forth in the pending applications of the said Albert F. Rockwell, hereinbefore set forth by date and number; and whereas the said Company desires to continue the manufacture and sale of cycle sundries, including Coaster Brakes, invented by the said Albert F. Rockwell;

Now THEREFORE, it is mutually covenanted and agreed by and between the said Albert F. Rockwell, for himself and his legal representatives, and the Company, for itself, its successors and assigns, as follows, to wit:—

1. The said Albert F. Rockwell hereby gives and grants unto the Company, its successors and assigns, the exclusive leave and license to make, use and sell to others, throughout the United States and Foreign Countries, Brakes and Coaster Brakes embodying any or all of the inventions set forth in the applications pending in the

in the agreement, but those of the other officers were greatly advanced: for instance, Charles T. Treadway,

United States Patent Office as hereinbefore set forth by date and number, and any Letters Patent of the United States which may be granted thereon, or any division or renewal thereof, and also the exclusive leave and license to make and sell Brakes and Coaster Brakes embodying any or all of such inventions of the said Albert F. Rockwell as may be set forth in any and all applications which are now pending and any and all Letters Patent which may have been or may hereafter be granted in any and all Foreign Countries for such inventions of Albert F. Rockwell relating to Brakes and Coaster Brakes, to the full end of the term for which any Letters Patent, both of the United States and Foreign Countries, are or may be granted.

2. The said Albert F. Rockwell will impart to the Company any and all information regarding any inventions or improvements in Brakes and Coaster Brakes, which may hereafter be invented by him, or of which he may hereafter become possessed, immediately upon his inventing or becoming possessed thereof; and will upon the request of the Company execute all applications, licenses or other written instruments which may be necessary or desirable to apply for and secure Letters Patent for the said improvements in Brakes and Coaster Brakes, in the United States and in such Foreign Countries as may be desired by the Company, and to secure to the said Company the exclusive leave and license to manufacture and sell all such inventions and improvements in Brakes and Coaster Brakes, in the United States and in such Foreign Countries as may be desired by the Company, and to secure to the said Company the exclusive leave and license to manufacture and sell all such inventions and improvements in Brakes and Coaster Brakes in the United States and Foreign Countries, under any and all Letters Patent which may be granted for the said inventions and improvements in Brakes and Coaster Brakes, in the United States and in Foreign Countries, to the full end of the term for which any and all such Letters Patent may be granted.

3. The said Albert F. Rockwell, for himself and his legal representatives, hereby ratifies and approves the constructive license to the Company under which the Company has heretofore made and sold Brakes and Coaster Brakes, and also ratifies and approves the License given by the Company to The P. and F. Corbin Company of New Britain, Connecticut, to manufacture Brakes and Coaster Brakes, embodying any or all of the inventions or improvements of the said Albert F. Rockwell, and agrees that the Company may extend the term of said License to The P. and F. Corbin Company

the treasurer, who received $1,500 a year in 1903, was paid $14,000 in 1914, and Page, who received $1,800

upon its expiration and include therein the right and leave to make and sell Brakes and Coaster Brakes embodying any and all inventions or improvements which may hereafter be invented or acquired by the said Albert F. Rockwell, but it is distinctly understood and agreed that nothing herein contained shall permit the Company to grant other Licenses than to The P. and F. Corbin Company, or to assign, or otherwise dispose, of its rights under this agreement in such manner as to avoid its obligations to the said Albert F. Rockwell or his legal representatives or assigns as hereinafter provided, without having first obtained in writing the consent of the said Albert F. Rockwell or his legal representatives.

4. The said Albert F. Rockwell will execute and deliver to the Company, all applications, assignments and other written instruments, which may be necessary or desirable to secure Letters Patent of the United States and Foreign Countries, and to vest the absolute title thereto in the Company, for the full end of the term for which all said Letters Patent may be granted, for any and all other inventions or improvements of every description not relating to Brakes or Coaster Brakes now possessed by, or which may be hereafter invented and acquired by, the said Albert F. Rockwell, and that immediately upon so inventing or acquiring any such other inventions or improvements he will impart to the Company full information of the manner of using and constructing the same, the assignments to the Company to be made in each and every case at the time of filing of each and every application in the United States and Foreign Countries.

5. In consideration of the covenants and agreements of the said Albert F. Rockwell, herein contained, the Company, for itself, its successors and assigns, hereby covenants and agrees that it will at once ascertain from its books the number of Brakes and Coaster Brakes, which have been manufactured and sold by it during the six months next preceding the date hereof extending from January 1st, 1903, to June 30th, 1903, embodying or containing any of the inventions in Brakes and Coaster Brakes covered by this agreement; to render a true report of the number thereof to the said Albert F. Rockwell and to pay to him upon the signing of this agreement the sum of five cents for each and every such Brake and Coaster Brake, so manufactured and sold during said period of six months; and that it will hereafter, keep accurate account of the number of Brakes or Coaster Brakes embodying any of the inventions or improvements in Brakes and Coaster Brakes, included within the terms of this agreement, and during and continuing dur-

in 1903, was paid $12,000 in 1912. The payment of both royalties and salary to the plaintiff under the

ing the terms of any and all patents for Brakes and Coaster Brakes included within the terms of this agreement, and to render to the said Albert F. Rockwell upon the first of each month hereafter, a statement of the number of Brakes and Coaster Brakes, embodying any of the inventions covered by this agreement, which were made and sold by the Company during the next preceding month, and to pay to said Albert F. Rockwell the sum of five cents on each and every Brake and Coaster Brake so made and sold; excepting, and it is hereby mutually understood and agreed, that the payment of five cents each shall continue only so long as the Company can sell such Brakes and Coaster Brakes at a price which will show a net profit of seventy-five cents or more exclusive of depreciation of plant, or new equipment added on each Brake or Coaster Brake manufactured and sold by the Company. Should the profits on each Brake and Coaster Brake fall below seventy-five cents, then and in that event, the royalty of five cents each payable to the said Albert F. Rockwell shall be reduced in proportion as such profits as are actually made shall be less than seventy-five cents, and such reduced royalty shall continue until the profits shall again be seventy-five cents on each Brake or Coaster Brake.

6. Upon all other manufactures of the Company which shall embody any of the future inventions of the said Albert F. Rockwell, not relating to Brakes and Coaster Brakes, excepting those lines which the Company is now making, the Company is to pay no royalty to the said Rockwell, until the manufacture and sale of such other articles by the Company embodying any or all of such other inventions of the said Albert F. Rockwell shall in any particular line of such manufacture amount to and show a net profit to the Company of Fifty Thousand Dollars ($50,000.00) per annum and a manufacturing profit exclusive of depreciation of plant and new equipment added of at least sixteen and two thirds per cent (16 2/3%). When such sales of articles embodying any of the future inventions of the said Albert F. Rockwell, other than Brakes or Coaster Brakes, shall show in any particular line of such articles an annual net profit of Fifty Thousand Dollars ($50,000.00) to the Company, and which shall not be less than a profit of sixteen and two thirds per cent (16 2/3%), then and in that event the Company shall pay to the said Albert F. Rockwell, in addition to the royalties on Brakes and Coaster Brakes, a sum equaling two per cent (2%) on the net sales, providing, however, that no payment shall be made on articles other than Brakes and Coaster Brakes, in any year when the net manufacturing profits on such other articles

agreement of 1903 was intended by the parties as one compensation for his services, whether they resulted

shall be less than Twenty-Five Thousand Dollars ($25,000.00), or less than sixteen and two thirds per cent (16 2/3%), exclusive of depreciation of plant and new equipment added.

7. Nothing is to be paid to the said Albert F. Rockwell on account of the manufacture and sale of articles other than Brakes and Coaster Brakes by the Company prior to the date of this agreement.

8. All payments made to Albert F. Rockwell under the terms of this agreement are to be figured by the Company as a part of the manufacturing cost of such articles on account of which such payments are made, and the amount of such royalties to be determined by the profits to the Company appearing after the manufacturing costs are thus determined.

9. Albert F. Rockwell is to remain in the employ of the Company and use his best efforts in the interests of the Company so long as the Company shall elect, and shall receive a salary for his services, exclusive of any sum or sums which may be paid to him hereunder as royalties, the sum of Five Thousand Dollars ($5,000.00) payable in equal monthly payments. Should the said Albert F. Rockwell voluntarily leave the employment of the Company for any other reason than the nonpayment of his royalties and salary as provided herein, then and in that event all payments to him under this agreement whether as royalties or salary shall cease and determine; but said Albert F. Rockwell agrees that the rights of the Company to his inventions shall continue, and that he will perfect the title of the Company absolute to any and all inventions, improvements and Letters Patent which he may have invented or acquired or which he shall hereafter invent or acquire.

10. In the event of the death of Albert F. Rockwell this agreement is to continue with his heirs and legal representatives, and all payments of royalties to be made and payable to them by the Company, in the same manner and at the same times as payable to the said Albert F. Rockwell, but the payment on account of salary to be discontinued.

11. The Company is to pay all the costs of securing patents, including Attorney's fees, also for the preparation of all legal documents in connection therewith; is to assume all risks for infringement in the manufacture and sale of such patented articles, and to pay all costs of litigation and damages in connection with suits to maintain said patents or for infringement of other patents.

IN WITNESS WHEREOF, the said Albert F. Rockwell has hereunto set his hand and seal, and the said Company has caused its name

Rockwell *v*. New Departure Mfg. Co.

in patentable inventions or produced nonpatentable improvements or methods, or were of an executive nature. "The parties did not intend that the provisions of this agreement should be severable, setting on the one hand those portions which vested in the defendant the rights to the plaintiff's inventions and the payments to him by way of royalties and commissions, and on the other those portions which relate to his employment, his salary and the results following from his voluntary withdrawal." The word "embody," when used in the law of patents and used in the patent profession, has this meaning: "A given structure embodies the invention of a patent when it contains the substance and heart of that patent, and irrespective of whether or not there has been an exact copying of every detail."

Upon the execution of this agreement, defendant paid plaintiff $8,533.95, being the amount therein agreed as due for coaster brakes previously made and sold by it, and after that time defendant paid or offered to pay plaintiff the stipulated royalties on coaster brakes, until as hereinafter recited. The net profits of defendant for 1902 were about $50,000, and thereafter increased rapidly. From the execution of the agreement until the latter part of 1913, the plaintiff continued as the moving spirit in the company, was its general manager, a director, and for most of this period its president. It was part of his duty as general manager and chief executive to cheapen production of its products by improved shop practices and methods of production. During this period the policies and more important matters concerning defendant were dis-

to be signed and its corporate seal to be attached by an officer having the authority so to do, and each of them to a duplicate original hereof at Bristol, in the County of Hartford and State of Connecticut, this first day of July, 1903.

cussed and decided by the board of directors, but the manufacturing ability and experience of the plaintiff and his inventive skill gave him great influence in defendant's affairs; the other directors and officers depended very largely upon him, particularly as regards patents, royalty agreements and the like, and the success of defendant was largely due to plaintiff's executive, mechanical and inventive abilities exercised in its behalf. Plaintiff, in 1904, assigned to defendant his entire title and interest to his three coaster brake patents and all rights under two pending applications for patents for improvements in wheel hubs, and to an invention he had made of a variable speed coasting and braking hub, and after July 1st, 1903, plaintiff invented or acquired a large number of devices and processes for manufacture, and in pursuance of this agreement assigned these to defendant. During many years prior to and after July 1st, 1903, and while plaintiff was general manager and the active head of defendant, the inventions of other employees of defendant were by them assigned to defendant without other consideration than their regular salaries.

### The Copeland Patent.

One Copeland made application for a coaster brake patent six months before Townsend made his application. In an interference proceeding between the Townsend and Copeland applications, the Patent Office awarded priority to the Copeland invention. Thereafter the Copeland patent dominated the industry and if held by interests adverse to the defendant, it would have prevented the continuance of defendant's coaster brake business. Copeland's invention, subsequently patented, was owned by the Pope Company, and solely through the efforts of the plaintiff was

assigned to defendant because plaintiff considered that his agreement required him to do so. In so acting plaintiff was not acting individually, but as executive head of defendant from whom came the consideration for the assignment. The Copeland patent was issued to defendant in 1913, and will expire August 5th, 1930. This patent was invented by Copeland and did not include any invention of plaintiff.

## Coaster Brakes.

Since the application of the Copeland invention and down to the time of the trial, the coaster brake made by defendant has been of a structure covered by the Townsend and Copeland patents, and has included, as an integral part of its mechanism, certain improvements invented by plaintiff and covered by three patents. The licenses to make, use or sell brakes or coaster brakes granted by the defendant, had included rights under patents issued under the inventions of Townsend and Copeland and plaintiff as well as those of others, but domestic licensees were in general restricted from using the distinctive invention of the plaintiff described as a clutch member having both interior and exterior tapered clutch surfaces.

Prior to October 9th, 1906, plaintiff had obtained patents in foreign countries upon the coaster brake inventions that he had made, and these on this date had either been assigned to defendant or were held by plaintiff for its benefit. Defendant had under plaintiff's direction built up in foreign countries a large coaster brake business and had established there factories for their manufacture and sale. The plaintiff also had granted, in behalf of defendant, licenses under foreign patents for the manufacture and sale of coaster brakes, excluding from such licenses, as he had done in the case of domestic licenses, his own invention in

coaster brakes. Plaintiff made many trips abroad and instituted forty legal actions for defendant in foreign countries in connection with the coaster brake business. In October, 1906, defendant's foreign coaster brake business was about three times greater than its domestic coaster brake business. On October 9th, 1906, defendant and Rockwell cancelled paragraph three of the agreement of July 1st, 1903, and substituted an agreement ratifying by Rockwell the licenses theretofore given to P. and F. Corbin Company, Corbin Screw Company, and George N. Pierce Company, "to manufacture coaster brakes embodying any or all the inventions or improvements" of plaintiff "relating to the same," and agreeing that defendant "may extend the same terms of said licenses upon their expiration and include the right" to make and sell coaster brakes embodying any and all inventions and improvements which may hereafter be invented or acquired by plaintiff. And plaintiff further agreed that defendant should have the right to license other persons or corporations than these "to manufacture and sell coaster brakes upon payment" by the defendant to plaintiff of ten per cent of the gross receipts under such licenses. In the vote of defendant accepting this modification of the agreement of July 1st, 1903, it is recited that the present agreement of October 9th, 1906, be interpreted to include fees received up to the present as well as the future with the exception of the three corporations before named, which were then the only domestic licenses in effect. The changes in the foreign business led to this modification, so as to avoid the necessity of securing plaintiff's written consent to licenses at home and abroad, or to other disposition of the rights involved in the agreement. After October 9th, 1906, plaintiff was not entitled to and did not receive nor claim royalties from licenses granted to the three

before-named corporations. Plaintiff gave defendant's bookkeeper instructions that he should not be credited a commission on royalties on domestic licenses, referring to the three named companies specially excepted in the October 9th, 1906, agreement. The bookkeeper thereafter excepted not only these three named companies, but all domestic licenses subsequently granted. Defendant through plaintiff did grant other domestic licenses, and this business was under plaintiff's direction and supervision; and the royalties paid on these amounted to $218,692.43 up to the latter part of October, 1914. The plaintiff saw from time to time reports made to the directors and to the annual meetings of defendant, and these showed that royalties were paid for domestic licenses and he was not credited with a commission on these. Plaintiff looked over these reports but did not study the details closely and paid no attention to whether or not he was receiving commissions on royalties from domestic licensees; he left the keeping of the credits to the bookkeeper and never received a detailed statement of these, but drew from time to time against his credits in general sums. The failure of defendant to credit and pay plaintiff the commission of ten per cent upon these domestic licenses was due to an oversight on the part of plaintiff and defendant.

### Single Row Bearings.

Plaintiff brought to the attention of defendant's board of directors, the subject of the manufacture of bearings. The single row bearing was not considered by the board a patentable invention, and the only hope of their profitable manufacture was by improved processes and methods of manufacture. In 1906, plaintiff invented improvements on double row bearings, procured a patent for this and assigned it to defendant,

which began the manufacture under this invention. Difficulties soon developed in their manufacture which were corrected by an invention of Graham, an employee of defendant, which was assigned to it. The double row bearing, manufactured and sold by the defendant down to the date of the trial, included in its structure plaintiff's invention, and defendant credited plaintiff with the royalties on their net sales down to March 1st, 1917. During the year ending June 30th, 1911, plaintiff developed the single row line of ball bearings and defendant commenced then and continued down to the trial to manufacture and sell these; it did not include in its structure any invention or improvement made by plaintiff, or owned or possessed by him, or in the acquisition of which by defendant he had any part. The so-called Radax bearing is a type of the single row bearing. The single and double row bearings are distinct types of bearings.

The defendant, prior to July 1st, 1903, manufactured and sold steel balls as separate articles of manufacture and sale; and in the manufacture of ball bearings defendant has at times used steel balls manufactured by itself or purchased from others. Various inventions and improvements invented and made by plaintiff and assigned to defendant were used by it in its manufacture of coaster brakes and bearings, more particularly two ball-grinding machines, a process for sizing and shaping, a hopper, and a comparator gauge, all covered by patents. In addition, the plaintiff introduced into the plant a process of electro-plating with copper, used in connection with a hardening process; he invented a new method for swaging balls, and he originated and established a wire-drawing and annealing department in defendant's plant.

The manufacture of single row bearings by the defendant constituted a new line of manufacture. The

inventions, methods and processes so introduced in defendant's plant by plaintiff, and including the inventions of one Neal, assigned to the company, resulted in a saving on single row bearings and Radax bearings taken together, of from six to ten per cent; on double row bearings, from four to five per cent of the selling price. For each year beginning with July 1st, 1909, the profits of defendant from the manufacture and sale of bearings has been in excess of $50,000. Plaintiff in 1911 informed Treadway, defendant's treasurer, that the receipts from the sale of bearings had passed the minimum fixed for the payment of royalties in the agreement of July 1st, 1903, and credits should be made to his account. The treasurer, without examining the contract, instructed the bookkeeper to give plaintiff credit upon the sales of bearings without specifying as to types. Plaintiff's account was thereupon credited on April 29th, 1911, with two per cent upon the net sales of all bearings, double and single row, sold from July 1st, 1909, to May 1st, 1911, amounting to $21,602.14. This agreement and the modifications thereof had not been particularly examined or discussed by any officer or director from its execution until 1914, except in connection with the modification made in October, 1906. Defendant continued to give credit to plaintiff for royalties upon bearings without regard to type; its books so credited him until and including November, 1914, and at no time prior to this date did it keep a separate account of money received from the sale of single row and of double row bearings. Both plaintiff and defendant supposed plaintiff was entitled to a royalty of two per cent upon all sales of bearings by defendant, whether single or double, and defendant knew that plaintiff was receiving this. The payments to plaintiff on account of single row bearings were made under a claimed mistake which was not discovered by

defendant until some time during 1914. From July 1st, 1903, on, the defendant had grown tremendously. For the year ending June 30th, 1913, its total production was $3,085,912.14; its net profits $783,739.99; and its surplus on that day $838,260.11.

On the advice of the plaintiff in 1913, the directors had consented to a large expansion of its manufacturing facilities at a large increase in expenditures, in the expectation that sales of bearings could be greatly increased during the year. In the fall of the year defendant faced a greatly decreased market for its bearings, due in part to its failure to produce bearings acceptable to the automobile trade. Defendant's expansion had cost far more than it had anticipated, it had a greatly increased inventory, and its maturing demands were between half a million and a million, with nothing on hand to meet them; in short, its financial condition was decidedly bad. Treadway, the treasurer, pointed out to plaintiff the need of reducing production, but defendant made no change in this regard, and Treadway also desired plaintiff to have an assistant, but plaintiff did not agree with him. The condition of defendant and the divergent opinions of plaintiff and the other directors resulted in a serious disagreement between plaintiff and Treadway, the latter being backed by the directors. Plaintiff finally proposed that the directors buy his stock, or sell that owned or controlled by them, being about one half of the outstanding stock, at $167.50 a share. Treadway, and the other directors except one, gave plaintiff an option to purchase their stock. Plaintiff failed to exercise his option, and also in his attempt to arrange to finance defendant otherwise. During his efforts plaintiff inquired of the other directors what the alternative would be if he failed, and they informed him that the only alternative was for the issue of $500,000 addi-

Rockwell *v.* New Departure Mfg. Co.

tional common stock, of which the directors should take $225,000, that Page be appointed general manager and Charles T. Treadway, formerly treasurer, should be chairman of the board of directors. Later plaintiff informed defendant of his failure to carry out the option and surrendered it, advising them to go ahead with their plan as outlined to him, to which he acceded prior to December 6th, 1913. On this date Treadway was elected chairman of the board and Page general manager, with authority covering all duties not specifically and otherwise imposed upon the said chairman, the secretary and treasurer and the president of the defendant. Soon thereafter defendant secured the funds by the issue of $500,000 of common stock; the new management took charge January 1st, 1914, and defendant's financial difficulties were overcome, and its business and profits greatly increased. Plaintiff continued as president and director with no reduction in income from defendant, but he was given no duties to perform except formal ones, pertaining to his office as president and with the understanding that he should have general charge of the patent matters of the defendant. Plaintiff was not permitted to exercise any power in the business of defendant during the years 1914, 1915 and 1916, except that he was to some extent consulted in patent matters and represented defendant in New York on some taxicab matters in which he was also personally interested. After plaintiff's demotion as general manager he ceased to have any executive functions. He was not permitted to attend the weekly meetings of the heads of departments at which factory requirements, complaints of customers, etc., were discussed. Plaintiff tendered his services from time to time to Page to assist him in working out factory problems, but they were not accepted. Early in 1914, plaintiff learned that defendant was buying large quan-

tities of steel balls instead of manufacturing them it-self, due to trouble in their manufacture. Plaintiff told Page and the board of directors that he could easily correct this, but neither accepted his offer. He offered his services in connection with the settlement of a suit against the Davis Company, but no response was made to this and it was settled without consulting him. A license under certain coaster brake patents was granted by defendant to the King Company, and plaintiff was not consulted as to this. Defendant, in the fall of 1914, secured a license from the Hess-Bright Company, owner of a patent granted to one Conrad, covering single row bearings, which had recently been declared valid and which the bearings made by the defendant were held to infringe, and under it had paid this company between two and three million dollars. While the taking of the license was pending, plaintiff informed the board of a plan by which the taking of this license could be avoided and the same result se-cured as with it, but they made no response to his offer. Plaintiff continued to make offers of assistance for a time, but ceased because defendant was absolutely un-responsive to them. He was ready and willing at all times during these years to render defendant any serv-ice in his power and gave defendant's officers and directors that assurance. Due to a feeling of unfriend-liness of plaintiff to Treadway and Page and more or less embarrassment and suspicion on their part toward him, it was practically impossible to take him into their counsel or give him any active part in the manage-ment.

In the spring of 1914, plaintiff procured an option for the purchase of one of defendant's principal com-petitors, the Standard Company, which was engaged in the production of ball bearings. Pending these nego-tiations plaintiff sought a modification of his agree-

ments with defendant which would release him from his obligations to render services to it, but without disclosing his proposed connection with this competitor. On August 12th, 1914, Treadway wrote plaintiff that "there will be no great hindrance to negotiations which you desire to enter into." Defendant's officers did not know of plaintiff's proposed purchase until September, 1914, when they learned of it, and thereafter plaintiff told Treadway of it, and that his purchase was contingent upon his securing the modifications of his contract. In October, 1914, plaintiff told Treadway and Page that he had been made perfectly helpless to do with defendant anything useful in the line of work in which he had had long experience and which was his stock in trade, and if they did not want his services he should be free to go elsewhere, and make the same line of goods, and unless he was restored as general manager, he would take up a similar line of work outside. Defendant was not willing to modify its agreement with plaintiff, at least to give him freedom to compete with it, and would not permit him to engage in a competitive business while he was receiving royalties and commissions from it. In the fall of 1914, defendant refused to modify this contract for the reason that the contract bound plaintiff not to go into competition with defendant and it was unwilling to permit him to do so. Plaintiff's inability to secure this modification, together with the difficulties in financing the undertaking, caused plaintiff to abandon his option.

About September, 1914, Treadway for the first time examined the agreements of defendant, and as a result wrote plaintiff he was uncertain as to what articles did embody his inventions and had submitted the matter to counsel, and pending adjustment would authorize the customary credits for July and August

without prejudice to defendant in the final adjustment. Treadway, on being advised by counsel, wrote plaintiff on November 21st, 1914, that defendant would cease on October 7th, 1914, crediting commissions to plaintiff on articles not embodying his inventions, namely, on single row and Radax bearings. Defendant's accounting department on November 18th, 1914, charged back on plaintiff's account $1,170.11 because of credits previously given him for single row bearings, and paid him nothing thereafter for these. Tenders were made plaintiff on December 21st, 1914, and up to April 30th, 1915, but plaintiff refused these because not including royalties for single row bearings. In the latter part of 1915, or in 1916, plaintiff sought to secure some payment on account of the indebtedness of the defendant to him, but was refused and informed that no payments would be made to him unless he gave a receipt in full discharge of the liability of the company to him. During negotiations for a settlement in the fall of 1914 and the following winter, plaintiff made claim to a commission upon royalties received by defendant from its licenses under its domestic coaster brake patents, but defendant immediately denied such liability. At the annual meeting on October 19th, 1915, plaintiff was not reëlected president, but by its vote was retained in the employ of defendant as indicated in section nine of the July 1st, 1903, contract, with the title of consulting patent expert. On receipt of a copy of this vote, plaintiff wrote Treadway saying he would move from his present offices and defendant could use these offices for other purposes, that he would be in Bristol part of the time, and would give immediate attention to any calls upon his services in line of this agreement. Thereafter plaintiff was not called upon to perform any services for defendant, nor given any opportunity by defendant, nor did he render any service to defend-

ant, either in an executive or inventive capacity. The purpose of defendant in paying or tendering plaintiff salary and royalties and electing him consulting patent expert was to retain him nominally in its employ, to fulfill its obligations to him under its agreements, and to prevent him from going into a competing business on his own account. Its position in 1914, 1915, and 1916, was that these agreements bound plaintiff to refrain from going into any competing business so long as defendant continued to employ him and fulfill its obligations with him. Plaintiff during these years was uncertain as to his rights under the agreements, and desired to prevent defendant from claiming that he had voluntarily left its employ for other causes than non-payment of salary and royalties. On January 31st, 1917, plaintiff wrote defendant that he could see no reason for withholding the amounts it agreed were due him, except to harass him, and defendant replied that it was acting by advice of counsel, and would insist that payment should be accepted by plaintiff in full settlement. Until the end of February, 1917, defendant continued to credit salary and royalties to plaintiff, and considered its vote of October 15th, 1915, to be in force. Plaintiff became president of the Marlin Arms Company in December, 1915, and until about March 1st, 1917, was in no sense in competition with defendant, and defendant made no objection to plaintiff's connection with it during this period. During 1916, plaintiff resumed negotiations with the Standard Company, which about January 1st, 1917, resulted in a plan agreed upon for the taking over of the Rockwell-Drake Company and the Standard Company by the Marlin Arms Company, which in a circular issued in February, 1917, stated that its manufacture of roller bearings would be under the supervision of plaintiff, who "will be obliged to give up substantial interests which he

now holds in other roller bearing concerns," referring to defendant. The Rockwell-Drake Corporation was organized by Hugh M. Rockwell, son of plaintiff, its president, and entered upon its manufacture and sale of ball bearings in a factory built upon land given to his son by plaintiff. Subsequently Marlin Company changed its name to Marlin-Rockwell Corporation. Plaintiff had a large investment in this corporation, some 19,000 shares of the 60,000 or 65,000 capital stock, and on March 1st, 1917, plaintiff entered into contract with this corporation by which he became its president and in entire charge of its extension business so-called, including therein the manufacture of roller and ball bearings and steel balls, etc., and this contract referred to plaintiff's interests in and connection with other ball bearings concerns, and to his giving up of these, meaning defendant. Coincident with this contract, plaintiff began this action. Plaintiff assumed his duties with Marlin-Rockwell Corporation, knowing defendant would regard this as a definite breach of his obligations to it. He did this because he had nothing to do and was tired of his inactivity, and this gave him an opportunity to enter into a business for which he was best qualified to act and because he expected to make a large sum of money in connection with it. He did not leave defendant's employment because of nonpayment of royalties and salary. He so continued in this manufacture, competing with defendant, up to the trial. On March 9th, 1917, defendant voted that plaintiff had left its employment and authorized the secretary to make demand upon him for a detailed statement of his acts in connection with any other ball bearing or roller bearing concerns, which demand was made, and plaintiff never disputed the recitals of the vote that he had left defendant's employment. Plaintiff replied to the secretary that Marlin Arms

Corporation of which he was president had bought the two concerns above referred to. Thereafter defendant ceased making any credits to plaintiff, and both parties regarded the contract between them as at an end. Defendant has continued to manufacture and sell coaster brakes, double and single row bearings in large quantities and at large profit, and to receive royalties from both foreign and domestic licenses to make coaster brakes after February 1st, 1917, to January 31st, 1923, and if plaintiff's claims are sustained there will be due him a large sum. On March 23d, 1923, during the trial, defendant paid plaintiff $156,755.71, it being made and accepted without condition and accompanied by a statement indicating the items to which the payment applied.

Further facts appear in the opinion.

The trial court reached the following conclusions:

1. The plaintiff was entitled to the royalty upon the coaster brake as embodying inventions made by him.

2. He was not entitled to any royalties arising out of the Townsend and Copeland patents.

3. Plaintiff was entitled to commissions on all licenses foreign and domestic to manufacture coaster brakes, except those to the Corbin, Pope and Pierce Companies.

4. The term "embody," as used in the agreements, means that an article, to "embody" an invention, shall include that invention within or as an integral part of its structure or mechanism, and does not include inventions, or processes or methods patented or unpatented, which are not so included in the articles, although they may result in a cheapening or bettering of the article or of the processes of construction.

5. The double row bearing has always embodied

an invention of the plaintiff, and he is entitled to royalty on sales of the same.

6.   The single row bearing did not embody any invention or improvement of the plaintiff, and he is not entitled to royalty on its sales.

7.   The double row bearings and single row bearings constituted separate "lines" of manufacture.

8.   The plaintiff is entitled to recover the agreed salary up to the time he left the employment of defendant on or about March 1st, 1917.

9.   The provisions of the agreement of 1903 are not severable so that, on one side, may be set those which relate to the vesting in the company of the rights to plaintiff's inventions and the payments to him by way of royalties and commissions, and on the other, those relating to his employment, his salary, and the results following his voluntary withdrawal from that employment.

10.   Even though the provisions of the ninth paragraph of the agreement are such as to make the agreement unilateral in its nature, still, so far as the contract had been executed, the law would give effect to their terms as fixing the rights of the parties.

11.   The provisions of this paragraph by virtue of which the payments of royalties were to cease and determine upon the plaintiff's voluntary withdrawal from the defendant's employment is not unenforceable against him as a penalty.

12.   The plaintiff on or about March 1st, 1917, voluntarily left the employment of defendant for a reason other than the nonpayment of his royalties and salary, within the meaning of the ninth paragraph of the agreement of 1903.

13.   He is not, therefore, entitled to recover any royalties, commissions or salaries which had not accrued to him on or before that day.

14.    The defendant is entitled to recover from the plaintiff all sums it paid to him, as royalties upon the sale of single row bearings.

15.    Judgment for an accounting should enter as on file.

The trial court overruled the claims of defendant forming the basis of its appeal, as follows:

1.    The agreement of October 9th, 1906, does not by its terms extend to and include receipts from domestic licenses for the manufacture and sale of coaster brakes, and it was not the intention of the parties that plaintiff should be paid a commission on defendant's receipts from royalties therefrom.

2.    If the language of the agreement of October 9th, 1906, can be construed as entitling plaintiff to any payment on defendant's receipts under such domestic licenses, then there was a mutual mistake in the drafting and provisions of said agreement.

Many errors are assigned in plaintiff's reasons of appeal, challenging the conclusions of law reached by the trial court, but those relied upon are summarized and developed in his brief and will be considered in the form there presented.

The defendant pursues only the errors assigned by it with respect to the conclusions of the court as above set forth relating to domestic licenses, and does not urge certain other reasons of appeal appearing on the record. It also made a motion to correct the finding which was in some respects denied by the trial court, and error is assigned based on the refusal. This point was not pursued on appeal.

*Samuel W. Moore* of New York City, and *Arthur L. Shipman,* with whom was *Dean S. Edmonds* of New York City, for the plaintiff.

*Melville Church* of Washington, D. C., *John Thomas Smith* of New York City, and *John T. Robinson,* with whom was *William J. Malone* of New York City, for the defendant.

KEELER, J. The questions arising on the record in the instant case are largely concerned with the construction of the contract of 1903 as modified in certain particulars by the supplementary contract of 1906. Upon such construction depends the answer to the question whether plaintiff left the employment of defendant for any reason other than the nonpayment to him by defendant of his salary, royalties and commissions; and if it is determined that he did not leave such employment for any other reason, then what factors of compensation should be considered in an accounting to be had between the parties. Subordinate to these considerations are plaintiff's claims that the provision that royalties, commissions and salary shall cease and determine in the contingency the plaintiff voluntarily should leave the employment of defendant for any other reason than nonfulfillment of the obligations of the defendant to him, is a penalty and not enforceable, and that the provisions for salary on one hand, and commissions and royalties on the other, are independent.

The trial court reached the conclusion, and found in its interlocutory judgment, that the contract of July 1st, 1903, as modified, continued in force until March 1st, 1917, when the plaintiff voluntarily left the employment of the defendant for reasons other than the nonpayment of his royalties and salary, and that at this time both parties to the contract regarded the contract between them as at an end, and rendered its judgment excluding from the accounting ordered, commissions and royalties beyond March 1st, 1917.

The plaintiff assigns as error this conclusion, for the reasons (1) that the defendant first breached the contract by failing to give plaintiff an opportunity to perform the services required of him by the contract and thereby wrongfully discontinued his employment; (2) that the plaintiff left the employment because he was not paid royalties and salary and was denied the opportunity to render service as contracted; (3) that the plaintiff was entitled to leave defendant's employ at any time and without notice without breaching his contract; (4) that the provision in paragraph nine of the contract, that should plaintiff voluntarily leave the employment of defendant for any other reason than the nonpayment of royalties and salary, payment under the contract of royalties and salary should cease, but the right of defendant to the inventions of the plaintiff should continue, is a penalty and unenforceable.

The first requirement in the solution of this alleged error is to ascertain the chief obligations this contract imposes upon the parties to it. The plaintiff agrees to license defendant to make, use and sell, through the United States and foreign countries, brakes and coaster brakes embodying his inventions thereof, as in application pending in these countries and in letters patent granted thereon, for the life of the patents; and to give defendant information regarding all inventions or improvements upon such brakes or coaster brakes in such countries, and to grant to defendant exclusive license to manufacture and sell the same and to transfer the absolute title to the same to the defendant. The plaintiff further agrees to remain in the employ of the defendant and use his best efforts in its interest so long as it shall elect.

On its part, the defendant agrees to pay plaintiff a salary of $5,000, and certain specified royalties and

commissions on brakes and coaster brakes, and upon all other manufactures of the defendant hereafter which shall embody any of the future inventions of the plaintiff not relating to brakes and coaster brakes, excepting those lines which the defendant was then making. The parties entered upon the performance of this contract and continued without a difference until 1914. The contract is in some particulars inartificially drawn. It obviously does not express the intention of both parties as to at least one of the obligations of plaintiff and one of the defendant, which both parties intended to be a part of the contract. Wherever one party to a contract enters upon the performance of an express obligation imposed upon him by a contract, the law implies a corresponding obligation on the part of the other party to the contract which reasonable men would understand must have been intended to be included. Thus, when one party promises to pay another royalties upon his future inventions, the law will imply an obligation upon the recipient of the royalties to license or transfer these patents to the person agreeing to pay the royalties, for this is the only way in which consideration for the payment of the royalties could be made. So where one party assumes an express obligation, the law raises by implication a corresponding obligation on the part of the other party to the contract to provide him with all reasonable opportunity to perform the obligation. Obligations of this character implied by law are given the same force and effect as if expressed in the contract, and in fact are treated in the law as though written in the contract. This principle is of such universal acceptance that we cite only a few of the many authorities to it.

Williston on Contracts, Vol 3, § 1293, says: "It is not only for a breach of express promises that a con-

tractor is liable but of implied promises as well. . . .
Since the governing principle in the formation of con-
tracts is the justifiable assumption by one party of a
certain intention on the part of the other, the under-
taking of each promisor in a contract must include any
promises which a reasonable person in the position
of the promisee would be justified in understanding
were included. . . . So though a contract of employ-
ment contains no other express promise on the part
of the employer than to pay a stipulated compensa-
tion, there is an implied promise to employ which is
violated by a refusal to allow the employee to perform
his duties as such, though there is no refusal to pay the
compensation." We have completely adopted this prin-
ciple. Thus in *Hayes* v. *Clark*, 95 Conn. 510, 515, 111
Atl. 781, 783, we hold: "The defendant fails to appre-
ciate that, under certain circumstances, written con-
tracts bearing the signatures of both parties, which on
their face and by their express terms appear to be
obligatory on one party only, create a corresponding
and correlative obligation on the other party by impli-
cation." Again in *Lawler* v. *Murphy*, 58 Conn. 294,
309, 20 Atl. 457, 458, we say: "It is also a principle
of general application that whatever may be fairly
implied from the terms or language of an instrument,
is, in judgment of law, contained in it."

The parties understood that patents on such inven-
tions were to be transferred and plaintiff did transfer
a very considerable list of these. The law would imply
the provision for a transfer in order to meet the
obligation upon defendant expressly imposed to pay
for such manufacture and use. This implied obliga-
tion will also be aided by the other provisions of the
contract requiring defendant to pay the cost of taking
out such patents and providing that upon plaintiff
voluntarily leaving defendant, its right to these in-

ventions should continue. There is also a failure to provide in the contract that defendant shall continue to provide plaintiff with such employment that he may carry out the purposes of his employment. The primary purpose of the contract on the part of the defendant was to enable it to secure for itself plaintiff's inventive ability and all of his inventions during the life of the contract, and on the part of the plaintiff to obtain a more adequate compensation, as well as to "secure an opportunity to use his inventive and executive ability in a way to have them enure more largely to his benefit." In carrying out the contract, plaintiff did invent and transfer to defendant a large number of his inventions. These resulted in large profits to defendant and large amounts of royalties to plaintiff. To develop his inventions plaintiff had to use the equipment of defendant's factory and its employees at his will. He had to know defendant's manufacture, its methods and processes of business, the complaints and suggestions and needs of its customers, and of its employees. He got this by his active employment in the factory. He could not develop and improve existing inventions, methods and processes without this knowledge and this opportunity. From the earliest beginnings of this business plaintiff had had this opportunity, and through his executive ability and inventive genius with the means and instrumentalities at hand, had been developed a great manufacturing plant. It had grown out of the plaintiff's brain working with the opportunity which defendant furnished for the development of his inventions and improvements. The plaintiff contracted to "use his best efforts in the interest of the Company" in doing this work, which was the primary purpose of the contract. Without the opportunity which the defendant afforded him his inventive genius could neither develop nor im-

prove. His employment must be an active one, the defendant must coöperate in furnishing him that, or there could be no inventive product from his brain. And without such there could be no royalties resulting. The salary was a minor consideration to the plaintiff; the chief compensation was to be in the expected royalties. Plaintiff's counsel are correct in their assertion: "His opportunity to make future improvements and inventions, and to receive royalties therefrom, was the real consideration moving him." Both parties intended in this contract that plaintiff should continue, as he had theretofore done, to transfer his inventions to defendant, and derive his compensation therefor from the agreed-upon royalties thereon. The unescapable conclusion of law from these considerations is that the law will imply that defendant did agree to give plaintiff this opportunity and to provide him active employment so that he could carry out the obligation of his contract, and defendant could carry out its obligation to manufacture the products of his inventions and pay him the agreed-upon royalties therefor.

Up to about the fall of 1913, the plaintiff and his associates in defendant company had coöperated in friendly relations, and the recognition was general that the extraordinary success of the defendant had been due to plaintiff's executive, mechanical and inventive abilities. At this time the defendant found that its extensive expansion had resulted in turning its quick assets into goods and enlarging its outstanding obligations so that it was unable to meet those maturing shortly, amounting to upward of a half million dollars. This extension had been due to plaintiff's misjudgment of business conditions, shared at first by his fellow officers and later persisted in against the advice of Treadway, the treasurer. Dissensions arose between

the officers, who at his suggestion gave plaintiff an option on their stock and that which they could control. Plaintiff failed in his plan to take over this stock, and then the officers, with plaintiff's consent, arranged to raise funds to relieve the financial necessities of defendant and did so, and shortly defendant's business was again prosperous. A part of the plan of the new management involved the appointment of a general manager in place of plaintiff, with such authority as to cover all duties not specifically imposed upon the chairman of the board, the president and the treasurer. Thereafter plaintiff was given no duties to perform except formal ones, except that it was understood he should have general charge of patent matters. During 1914, 1915 and 1916, plaintiff was given no duties to perform except that he was to some extent consulted in patent matters by the patent attorney. He was not thereafter consulted by the officers of the defendant nor permitted to attend the weekly meetings of the heads of departments. - He tendered his services in working out factory problems and in patent matters, but he was not permitted to assist in these matters. During all this period plaintiff was ready and willing to render any assistance in his power for defendant, but was not given such opportunity. Defendant's position during this period was that it desired no services from plaintiff, but that he by the contract was forbidden from going into a competing business so long as defendant continued to make payments to him as provided by the contract and to keep him in his nominal position. This involved the right to hold the plaintiff in inactivity and prevent his fulfilling his obligation under the contract to make inventions and improvements for defendant. Unless plaintiff could use the factory equipment and employees and have the opportunity to know defendant's needs, the employees'

and customers' points of view, and to conduct experimentations, he could not fulfill his contract obligation. The finding makes it clear beyond all cavil that defendant took its position deliberately, and intentionally took from plaintiff all opportunity to render the service for which he was to receive his chief compensation. The defendant in fact denied him the opportunity to either improve existing inventions or to make new inventions for which under the contract defendant promised to pay him royalties. In 1915 it appointed him consulting patent expert. It was a nominal appointment, without duties, made to nominally fulfill its obligations to him and to prevent his going into a competing business. Defendant from the time the new management took over its control denied plaintiff his opportunity to fulfill his contract obligations. The right to this opportunity to make and develop his inventions was, as we have seen, an implied obligation of defendant and written into the contract by the law. As soon as defendant took and maintained this position, it breached the contract and thereafter plaintiff had the legal right to exercise his privilege and declare the contract at an end. *Anvil Mining Co.* v. *Humble,* 153 U. S. 540, 14 Sup. Ct. 876.

In *Sigmon* v. *Goldstone,* 101 N. Y. Supp. 984, 986, the court said of a similar contention: "It was one of the implied covenants of plaintiff's contract that he should be permitted to labor in the manner specified. It was a breach of this covenant for the defendants, without cause, to prohibit the plaintiff from doing any work and to shut him up in a dark room doing nothing, notwithstanding they continued to pay his weekly salary." The case of *In re Rubel Bronze and Metal Co. and Vos,* L. R. (1918) 1 K. B. 315, is one of the most illuminating cases upon this point in the books. It fits with exactness the course taken by this defend-

ant, and makes the demonstration complete that the denial of the opportunity to earn the contract sum may be by a course of conduct as well as by words, may be implied as well as express.

Near the end of the year 1914 plaintiff claimed that he should have had commissions on royalties received by the company from licenses given by it on domestic coaster brake patents, on account of which no payments had ever been made. He also made certain charges under the Copeland patent, and for royalties on single row bearings which latter had been theretofore allowed and paid him, but which later were claimed by the company not to be included under the terms of the contract and which the company proposed to charge back against the account of the plaintiff. Beginning in December, 1914, and up to April, 1915, tenders were made by defendant's bookkeeper covering the amount of plaintiff's salary, royalties and commissions, based on a statement of plaintiff's account made up in accordance with the claims of defendant, which tenders were refused by plaintiff solely for the reason that the amount tendered did not include royalties on single row bearings. On May 20th, 1915, plaintiff wrote defendant that he would not accept tenders of amounts which did not include royalties for single row and Radax bearings, and that this letter would obviate formal tenders and refusals in the future. In the latter part of 1915 or early in 1916, plaintiff sought to secure a payment on account of sums due him from the company, but his request was refused, and he was informed that no payments would be made to him unless he gave a full discharge of all the liabilities of the company to him. Plaintiff drew his salary up to May, 1915. No payment thereafter was made plaintiff until during the trial of the cause, when payment of the sum of $156,775.71 was made by defendant to plaintiff, the

payment being made and accepted without condition. A written statement of the items making up this amount was then filed in court and is made part of the court's finding. Prior to January 27th, 1917, plaintiff had written defendant asking for payment of such sums as defendant admitted were due him. This request was ignored, and he repeated it in another letter of January 31st, 1917, and in a letter of February 5th, defendant, as on the former occasion, refused to pay anything unless the payment was accepted in full settlement to date.

From the statement just referred to, which is made up entirely from the viewpoint of defendant, and included no items claimed by plaintiff which defendant disputes, it appears that at the end of January, 1917, there was due plaintiff in round figures $105,000, without interest, and when interest is added, $150,000. This sum or any part of it defendant refused to pay, unless plaintiff gave a receipt in full.

The seventh paragraph of the plaintiff's amended complaint, which the answer denies, is as follows: "7. Since the 30th day of November, 1914, defendant has refused to pay plaintiff any sums either as royalty or otherwise, except amounts which were materially and substantially less than the amounts actually due, and then only on condition that the amounts so tendered by defendant be accepted by plaintiff as in full of all claims on his part relating to such salary and royalties."

In paragraph nine of the contract of 1903, it is provided that if plaintiff should leave the employment of defendant for any other reason than nonpayment of royalties or salary, then all payments to him should cease and determine. In the paragraph of the complaint above quoted there are set up facts showing that he could not obtain payment of his royalties and salary

admitted to be due, unless he gave up all claims relating to certain other matters in dispute. Some of these disputed items the trial court found were in fact due him, but these latter he offered to waive and leave for further adjustment by suit, if necessary. By the contract plaintiff was to be paid a salary, also certain royalties and commissions not in dispute; he asks for payment of these and is refused unless he signs on the dotted line at the end of a receipt in full.

The trial court held that plaintiff did not withdraw from the employment on account of nonpayment to him, as above set forth, but voluntarily withdrew "because he was tired of his position of general uselessness and inactivity and because he had found an opportunity to use to better advantage his experience, knowledge and skill in the production of bearings." We do not think that this conclusion is borne out by the subordinate facts found, or that it legally or logically flows therefrom. It may well be that he was weary of the situation in which he found himself. Nothing is more apparent from the record, than that from the year 1914 and onward, other persons interested in the company were engaged in the process of freezing out the plaintiff, by depriving him of any position in the company where he could in any way conduct or supervise its production as he had theretofore done with marvelous success, and also by withholding money justly due him. His position was thereby probably made very irksome, and he might have longed to quit, as his associates in the business hoped he would. He naturally looked about to find some other sphere of activity, as he had a right to do, and Treadway and others concerned knew it, and he conferred and corresponded with the latter with a view to some adjustment of outstanding controversies which might bring about an amicable settlement. But the opposing parties did not want to let

him go under any conditions which would involve business competition, and he did not wish to withdraw in a way which would cause him loss in respect to his past inventions. For three years there was fencing for position between the parties, but it finally became evident to plaintiff that no amicable withdrawal could be effected, and he must stand on his legal rights. The company refused to pay him what it owed him. This conduct was an additional legal reason which the contract gave him for withdrawing without sacrifice of all benefit from his patents; he availed himself of it and brought suit for an accounting. He might have had many reasons, acting powerfully on him, for a release from an intolerable situation, reasons which under the contract would not justify withdrawal from his connection with the company, but these reasons, however impelling they may have been, would not deprive him of the benefit of his legal reason arising out of nonpayment by the company of pecuniary obligations to him. In the discussion contained in defendant's brief it is pointed out that this action is not for damages for breach of contract, which is true; but it is an action on the contract, and the breach proved furnishes the legal ground, under the terms of the contract, for the withdrawal by plaintiff from service of the company and a recovery of what was due him under the contract.

The conclusion reached by the trial court is stated in the finding both as a conclusion of fact and law. The other facts found do not justify either conclusion.

Plaintiff had a right to stand upon the breach of the contract in 1915 or 1916, and also upon the breach of the implied contract to afford him facilities to work, which we have discussed above; but he continued on and did not elect to treat these breaches as affecting the contract until the events of January and February,

1917, including defendant's last refusal to pay without a receipt in full.

The history of plaintiff's negotiation looking to a connection with the Standard Company, a competitor of defendant, is of no consequence, since the negotiations were abandoned. Moreover, they occurred after defendant had breached its contract with plaintiff by refusing to give him the opportunity to make and develop his inventions, and thereafter plaintiff could elect to stand on the breach and sever his connection with defendant without injury to his rights under the contract before his election, or to any right to recover damages or secure the retransfer of the patents transferred to defendant by him which might exist; in other words, the fact of his election would not prejudice any attempt which he might make to recover damages for the breach or a retransfer of the patents, or both remedies if appropriate. The continued tender to plaintiff of the salary and royalties, even though it had been made unconditionally and had included every item owed him, would not have satisfied defendant's obligations under this contract. Plaintiff had also the right to his opportunity to make and develop his inventions, and as counsel forcefully point out, the defendant not only denied him the opportunity to secure royalties from new inventions, but the keeping of plaintiff from his chosen field of labor was calculated to arrest his further growth and development as a manufacturer and inventor.

If our conclusions thus far be sound, it follows that it is immaterial in the consideration of the case whether or not plaintiff's contention that paragraph nine of the contract, which provides that "should the said Albert F. Rockwell voluntarily leave the employment of the Company for any other reason than the nonpayment of his royalties and salary as provided herein," all

payments under the contract should cease and determine, but the rights of defendant to plaintiff's inventions should continue—is in the nature of a penalty and unenforceable, and also that the contract is not severable.

On March 1st, 1917, plaintiff entered into a contract with Marlin-Rockwell Corporation by which its manufacture of roller bearings should be conducted under his supervision, thus engaging in a business competitive with defendant's. This action by plaintiff, in a vote of the board of directors of defendant, is recited as a breach by plaintiff of his contract with defendant. At this time the trial court finds "both parties regarded the contract between them as at an end." Since defendant first breached this contract, plaintiff's entry into the new relation was no more than a decisive expression of his election to accept as final defendant's prior breach of this contract. The recitals in this vote, uncontested by plaintiff, and claimed to constitute admissions upon his part, have no such effect, since the vote was passed after the plaintiff had signified his election to stand on defendant's breach of contract in the Marlin-Rockwell circular of February 27th, and in beginning this action two days later. Each of the parties up to this time was maneuvering for position and apparently unwilling to have the contract terminate.

On or about March 1st, 1917, plaintiff made his election to withdraw from the employ of the defendant, and as we have seen, because of the failure of the latter to afford him opportunity properly to carry out his obligations and rights under the contract and also to pay him the amounts due thereunder. Eight days afterward defendant declared by vote of its board of directors that plaintiff had voluntarily left the employment of the defendant for reasons other than

nonpayment of royalties and salary. There was no occasion for the plaintiff after receipt of the vote of March 9th, to deny the recitals in this vote and to reiterate the fact that his suit signified that he had brought his suit against defendant to recover by reason of the latter's breaches of the contract, which latter were the reasons of his leaving the employ of the defendant. The payment by the defendant on March 23d, 1923, during the trial, was made and accepted without condition, and did not include items occurring after March 1st, 1917, and hence does not affect the conclusion so far reached by us. These breaches, the refusal to give plaintiff an opportunity to make and develop his inventions and to pay plaintiff what defendant admittedly owed him, were continuing breaches and existent when plaintiff withdrew from the service of defendant.

Plaintiff's claim to royalties on coaster brakes manufactured under the Copeland patent is disposed of by the fact that "the Copeland invention and patent were never possessed by the plaintiff nor did he ever have any rights in or to the same."

The trial court found that the plaintiff was entitled to commissions on domestic royalties on coaster brakes, and did not err in so doing.

At the time of the contract of 1903, a domestic license to the Corbin Company was in existence, and was therein ratified. Afterward, but before the supplementary agreement of 1906, domestic licenses had been issued to the Pierce Company and to the Pope Company. Meanwhile the defendant company had developed a large business in Europe in these products, operating under patents owned either by plaintiff or the company; factories had been established and licenses granted abroad. In 1906, the plaintiff and two other directors of the company were in Europe and had negotiated for the alteration of certain agreements

Rockwell *v.* New Departure Mfg. Co.

under which the company conducted its business in Germany, and had also initiated certain arrangements looking to a possible sale of its foreign coaster brake business. After plaintiff's return from abroad a meeting of the directors of the company was held, and his actions and those of the other directors approved. A sale of the defendant's foreign business would require under the existing agreement between plaintiff and defendant, the written consent of the former, and this fact brought forward for consideration the provisions of that agreement, and finally led to the execution of the supplementary agreement in 1906, in modification of that of 1903. As set out in the statement of facts, the agreement of 1906 provided for the extension of the three domestic licenses then existing, and gave to the defendant the right to license other persons than those to manufacture and sell coaster brakes upon payment by defendant to plaintiff of a royalty of ten per cent upon gross receipts.

The change in the foreign business was undoubtedly the occasion of a revision of the relation between the parties as to coaster brake licenses, but there is nothing in the terms of the contract of 1906, which indicate that the new relations created by this instrument were only to apply to foreign licenses. On the contrary, there is every indication upon the face of the agreement that such was not its intent. If the parties were only contracting wtih reference to foreign licenses, why say anything about the three existing domestic licenses? These latter came in by way of exception from the other and general provisions of the agreement; had it been intended to apply only to foreign licenses, any mention of these three licenses would have been superfluous and inept. If only foreign business had been in mind, it is quite certain the fact would have been unmistakably indicated in the wording of the instrument,

while in fact its provisions are general and sweeping. The fact that the agreement also provides for a sale of the patents without restriction of locality, upon payment to plaintiff of ten per cent of the selling price, favors the construction given the instrument by the trial court. If only the European patents were to be sold, the agreement would have so provided.

The fact that plaintiff instructed the bookkeeper to credit him with commissions on foreign royalties and not on domestic royalties, is not significant as bearing upon the construction of the contract, nor as constituting an estoppel from afterward claiming such commissions. At the time such instruction was given it appears that there were no domestic licenses in existence except the three on which plaintiff was to receive no commissions; so, at the time, the instruction was technically correct. It is evident that when the time came when the volume of royalty receipts from domestic licenses was of a size to justify commissions to plaintiff, he neglected to notify the bookkeeper of changed conditions. It is further found by the court that plaintiff left the keeping of accounts of credits in his favor to the bookkeeper and never asked for nor received any detailed statement, merely asking from time to time what appeared to be due him, and drawing against it in lump sums. Plaintiff, as a director, from time to time saw reports which indicated that he was being paid as respects foreign licenses, but not on domestic licenses, but plaintiff never particularly noticed the statements which showed the lack of credit to him in this regard. The contract of 1906 does not seem to have been scrutinized with any attention until dissensions arose between plaintiff and his associate officers in the company, and this is not strange; the progress of the company had been such as to afford a wonderful pecuniary return, money was plenty for all, and pros-

pects of the company (as the sequel confirms) promised riches "beyond the dreams of avarice." The construction given to the contract by the trial court upon the point under discussion is not only justified by its terms, and the position of the parties at the time it was made, but is fair and equitable. Under paragraph four of the agreement of 1903, the written consent of plaintiff was required for all licenses other than the existing Corbin license; the provision in the modifying contract of 1906 does away with the necessity of that consent, and hence the commission provided is the only way in which the interests of the plaintiff might be safeguarded. The facts found by the trial court clearly support its express holding that the contract of 1906 was not made under any mutual mistake.

As respects payments due plaintiff upon proceeds of domestic royalties, the trial court applied the statute of limitations as plead by defendant, and thereby excluded from the account all items in this regard of earlier date than six years prior to the commencement of the action; we infer that the court applied the statute analogically upon the principle of laches, since the action is an equitable one and the statute is not *stricti juris* a bar. The action is for an accounting, for a judicial determination and statement of the true financial obligations between the parties. It would not have mattered if upon the company's ledger there had been no special account of plaintiff's earnings on one side and of payments to him from time to time on the other; providing the material for the preparation of such an account existed in the general books of the company, as was undoubtedly the case. "The word 'account' has no clearly defined legal meaning or definition. In its primary meaning an account is some matter of debt or credit, or of a demand in the nature of debt or credit between the parties, arising out of a

contract or fiduciary relation or from some duty imposed by law, and is not required to be in any particular form or necessarily to contain detailed information. The word is flexible in its meaning, depending somewhat upon surrounding circumstances and the connection in which it is used." *State* v. *Illinois Central R. Co.*, 246 Ill. 188, 227, 92 N. E. 814. The coaster brake account was not a distinct account separate from other debit and credit items arising out of the various contracts between the parties; it was not so in law, and it was not so in fact as kept by the bookkeeper, since the account so kept credited the plaintiff with his commissions on foreign licenses, together with all sums due him otherwise on his general transactions in his pecuniary relations with the company. The trial court has found that the failure of defendant to credit and pay plaintiff a commission upon certain domestic licenses was due to an oversight of both plaintiff and defendant; in other words, there was a mutual mistake in this respect. In that particular account items were omitted which should have appeared therein. Such being the case, equity considers the same to have been in the account, because they should have been there, and there can be no proper application of the statute of limitations, strictly or by way of analogy. It was as much the duty of defendant to see that these items were included as it was that of plaintiff. Considering such items as placed in the account, it becomes an ordinary mutual account, with items on each side thereof, with no hiatus of six years giving any warrant for applying the statute of limitations.

We now pass to the question of the right of the plaintiff to recover commissions, under paragraph six of the contract, on single row bearings. These did not contain within or as a part of their physical structure any invention of the plaintiff, but several patented

machines or processes invented by plaintiff were used in manufacturing the balls contained in both double and single row bearings. On this state of fact the trial court ruled that the plaintiff was not entitled to commissions on single row bearings, because such bearings were not "manufactures embodying" any invention of the plaintiff. The words "embodied," "embodying" or "embody" are used thirteen times in the contract. The preliminary recitals describe one patent and three applications, all of which are for articles of manufacture as distinguished from machines or processes, and all of which are described as "applicable to and designed to be embodied in" coaster brakes; also that the plaintiff has patented named "improvements in bicycles, cyclometers, bells and other articles of manufacture;" also that the defendant company is engaged in the manufacture and sale "of devices embodying and containing" the inventions of Albert F. Rockwell "as set forth" in the "aforesaid" patents and applications, and is engaged in the manufacture and sale of coaster brakes "embodying the inventions or some of the inventions . . . of the said Albert F. Rockwell, hereinbefore set forth by date and number." In the first five paragraphs of the contract the word "embodying" or the phrase "embodying and containing" is used seven times; always referring to the embodiment in brakes or coaster brakes of one or more of the inventions set forth in the preamble; and since these inventions are specifically described either as brakes or improvements or devices or articles of manufacture designed to be embodied in brakes or coaster brakes, it necessarily follows that the term "embodying" is consistently used down to paragraph six in its primary and ordinary sense of incorporating, incarnating, or giving concrete form to the inventions referred to. Coming now to paragraph six, its material portions are as follows: "Upon all

other manufactures of the Company which shall embody any of the future inventions of the said Albert F. Rockwell, not relating to brakes and coaster brakes, excepting those lines which the Company is now making, the Company is to pay no royalty to the said Rockwell, until the manufacture and sale of such other articles by the Company embodying any or all of such other inventions of the said Albert F. Rockwell shall in any particular line of such manufacture amount to and show a net profit to the Company [here follows the statement of the requisite profit] and in that event the Company shall pay . . . in addition to the royalties on brakes and coaster brakes, a sum equaling two per cent (2%) on the net sales," etc.

The presumption that the words "embody" and "embodying" are still used, as before, in their primary and ordinary sense is well-nigh conclusive, in the absence of any qualifying expression. Still more conclusive is the fact that in bargaining for royalties on future inventions, the parties stipulated for commissions on the sale of "manufactures" embodying any of plaintiff's future inventions, and did not use the comprehensive language of paragraph four, in which Rockwell agrees to assign to defendant "any and all other inventions or improvements of every description . . . which may be hereafter invented and acquired by the said Albert F. Rockwell." This distinction between "manufactures" and other classes of inventions is basic, statutory and familiar. The patent statute recognizes four classes of patentable inventions described therein, in the singular number, as "art, machine, manufacture or composition of matter." A "manufacture" is commonly called an article of manufacture, and that phrase is used in the preamble of this contract in its accepted sense of a concrete marketable product. That the word "manufacture" is also used in paragraph six in the statutory

sense, is shown by the use of the phrase "such other articles" as synonymous with the "other manufactures" upon the profitable sale of which the payment of commissions is conditional. The trial court did not err in so construing the contract.

Plaintiff claims that the parties have put a practical construction on the contract by the payment and receipt of commissions on all bearings, without making any distinction between double row and single row bearings, between May, 1911, and September, 1914. The effect of including commissions on sales of single row bearings in these payments depends on the facts found. The contract was executed July 1st, 1903, and defendant's copy of it remained in plaintiff's hands for some years before it was turned over to defendant's treasurer with a mass of other papers. It was thereafter available for inspection by any director, and though all of them knew of its general character, none was familiar with its terms, and none examined the contract or considered its terms with reference to plaintiff's right to commissions on single row bearings until 1914. Defendant did not begin to make and sell any new line of articles to which paragraph six might apply until some time in the fiscal year ending June 30th, 1909, when it commenced the manufacture of double row bearings unquestionably embodying an improvement in double row ball bearings patented by plaintiff in that same year. From and after July 1st, 1909, the defendant's annual profits on double row bearings exceeded the minimum, below which commissions were not payable, but because defendant was indebted to a syndicate of bankers, the payment of commissions to plaintiff was postponed until the loan was paid in April, 1911, when plaintiff told Charles T. Treadway, the treasurer of defendant, that he was entitled to be credited with commissions on bearings. Without ex-

amining the contract, and accepting plaintiff's statement, "as at that time he would have accepted almost any statement of the plaintiff," Treadway instructed the bookkeeper to give credit to plaintiff upon sale of bearings without specifying any distinction as to types. The manufacture of single row bearings had not been commenced until some time, not specified, in the fiscal year ending June 30th, 1911, so that the accumulated commissions from July, 1909, then credited to plaintiff, must have been chiefly earned on profits from sales of double row bearings. Defendant did not, until September, 1914, keep any separate account of its receipts from single row bearings. The trial court finds that "in seeking credit for royalties upon the basis of sales of all bearings, including single row bearings, plaintiff was proceeding upon a vague recollection of the terms of the agreement of July 1st, 1903, and Treadway, in authorizing the bookkeeper to give those credits, was acting upon his trust and confidence in plaintiff and in reliance upon the soundness of any such claim as he might make."

At that time no person who was a director in 1903, except plaintiff and one other who had been inactive for some years, was a director of or otherwise connected with defendant corporation. Under the circumstances, we think the trial court did not err in refusing to hold that the conduct of defendant amounted to a practical construction of the contract, for the reason that the payments were not in fact predicated upon any construction of the terms of the contract or upon any fresh or distinct recollection of the original agreement evidenced thereby.

The trial court went a step further and held that defendant was entitled, in the accounting, to recover back the commissions paid on single row bearings, as money paid under a mistake. We find ourselves unable

to agree with this ruling, because we are of opinion that the subordinate facts found are inconsistent with the existence of the kind of a mistake in respect of which equity will grant affirmative relief. Briefly, the parties stood on an equal footing, each having access to his own copy of the written contract, upon the true interpretation of which the existence of a debatable legal obligation depended. If Treadway, after consulting the writing, had deliberately agreed to plaintiff's interpretation of its terms, the payments of commissions on single row bearings would doubtless have been made under a mistake as to the legal effect of the document regarded as the sole expression of the intent of the parties. Yet it would then be idle to say that they were not voluntary payments, or that they might be recovered as money paid under a mistake of law. On the contrary, defendant would in such case be bound by consenting to a practical interpretation of its own contract which was within the limits of its possible construction. And while the fact that Treadway, the treasurer, acquiesced in the debatable claim of plaintiff, without looking at the contract, solely because he took it for granted that plaintiff was probably right about it, relieves defendant from the consequences of a deliberate and intentional assent to plaintiff's construction, it does not make the payments in question any the less voluntary in character, or impose upon plaintiff, who made his claim in good faith and still pursues it in good faith, any equitable obligation to refund the payments. In so holding, we do not question or weaken the authority of *Northrop* v. *Graves,* 19 Conn. 548, and our many other decisions holding that money paid under a mistake of fact or of law, which the recipient has no right in good conscience to retain, may be recovered back. We do hold that when the parties to a written contract stand on an equal

footing as to means of knowledge of their contract obligations, money paid by one to the other, in part performance of the contract, in response to a claim made in good faith and based upon a permissible but erroneous construction of the contract, cannot be recovered back as money paid under a mistake of law.

The contract contemplated the continued payment of royalties during the life of the patents under which the defendant manufactured articles embodying inventions of the plaintiff, or under which the defendant collected license fees for the use of patents issued to or acquired by the plaintiff. These payments were to cease in case the plaintiff voluntarily left the employ of the company for any other reason than the non-payment of his royalties and salary. Otherwise, by clear implication, they were to continue.

We have held the conclusion of the trial court, that plaintiff left the employ of defendant voluntarily and for a reason other than the nonpayment of salary, etc., to be erroneous, and it follows that the fixing of the date of March 1st, 1917, up to which an accounting should be taken, is incorrect. In his amended complaint plaintiff demands an accounting, and in paragraph twelve alleges, and the facts found show, that up to the date of filing this complaint (November 23d, 1921) defendant had continued to manufacture coaster brakes and bearings and other articles embodying plaintiff's inventions, and had sold the same for large sums, and that there had accrued to plaintiff a large amount of money, the amount of which is peculiarly known to defendant and unknown to plaintiff. The facts found, taken in connection with the more specific statement of patents filed therewith showing that some of the patents had not then expired, entitle plaintiff to an accounting down to the date of the

Rockwell *v.* New Departure Mfg. Co.

judgment to be rendered by the Superior Court in accordance with this opinion.

In addition to the credits allowed plaintiff in the judgment appealed from, he should be allowed commissions on all domestic licenses which included inventions made or acquired by him for the full period during which the patents were granted. The defendant should not be allowed any sums as a return of payments heretofore made on account of single row bearings.

The judgment of the Superior Court is erroneous in part, and the case is remanded for proceedings in accordance with this opinion.

In this opinion the other judges concurred.

## On Rehearing.

Defendant's motion for a reargument was confined to five points.

1. That the finding that plaintiff withdrew from the employment provided for in the contract because of defendant's breaches thereof was not properly before the court. This so-called finding was a conclusion, and is assigned in reason of appeal 6, and found in the plaintiff's claims of law 336, 337, 338, 339, 355, 356, 357, 358 and 360.

2 and 4. That the finding of the reason of plaintiff's withdrawal was one of fact, not of law, and not reviewable on this record. The so-called finding is a conclusion of fact reached from subordinate facts and is reviewable as a question of law. *Hayward* v. *Plant*, 98 Conn. 374, 119 Atl. 341.

3. That the pleadings are inconsistent with a finding of voluntary retirement on March 1st, 1917, with a right to royalties thereafter accruing. As we construe

the pleadings they are not inconsistent with the conclusion of voluntary retirement on March 1st, 1917, for the reasons stated in the opinion.

5. That the period of liability for commissions on domestic royalties should be made to correspond with the court's other holdings. The rescript has been corrected so far forth as this point is applicable.

Plaintiff's motion for a reargument was confined to the single point that the conclusions reached by the court upon plaintiff's claim for royalties on single row bearings were incorrect, and that plaintiff's claim thereon should be sustained. This claim has been reexamined, and as a result we find no occasion to change the conclusion reached by us or to supplement the grounds of our opinion upon this point.