TRENWICK AMERICA REINSURANCE
CORPORATION *v.* W. R. BERKLEY
CORPORATION ET AL.
(AC 33388)

Espinosa, Sheldon and Bishop, Js.

742

Argued April 17—officially released October 23, 2012

*Jonathan M. Freiman*, with whom was *Julie Lough-ran*, for the appellants-cross appellees (defendants).

*Augustus R. Southworth III*, with whom was *Todd R. Michaelis*, for the appellee-cross appellant (plaintiff).

*Opinion*

BISHOP, J. In this declaratory judgment action, the defendant W. R. Berkley Corporation[1] appeals from the judgment of the trial court, rendered in favor of the plaintiff, Trenwick America Reinsurance Corporation.

---

[1] The defendant W. R. Berkley Corporation is a holding company. Berkley Insurance Company, also named as a defendant in this appeal, is a subsidiary of W. R. Berkley Corporation. For convenience, we refer to them collectively as the defendant and individually by name when necessary.

On appeal, the defendant claims that the court improperly (1) concluded that there was no mutual mistake and (2) found that the commutation agreement was not ambiguous. The plaintiff cross appeals, claiming that the court improperly (1) concluded that there was no unjust enrichment and (2) denied its motion for attorney's fees. We affirm the judgment of the trial court.

The plaintiff is a reinsurance company with its principal place of business in Fairfield. The defendant is an insurance holding company with its principal place of business in Greenwich. At various times prior to September 3, 2004, the plaintiff entered into reinsurance agreements with the defendant and its subsidiary insurance companies.[2] The reinsurance agreement at issue in the present case obligated the plaintiff to reinsure certain liabilities of the defendant's insurance companies. More specifically, in exchange for premiums paid by the defendant, the plaintiff agreed to pay a stated percentage of the defendant's insurance companies' losses, claims, and other expenses.

The plaintiff and Signet Star Reinsurance Company (Signet Star),[3] a reinsurance company that is a subsidiary of the defendant, entered into an agreement on June 10, 1999, referred to as Special Casualty and Accident Reinsurance Facility (SCARF II). The trial court noted that SCARF II obligated the plaintiff "to accept a ten percent part of sixty percent of Signet Star's overall

---

[2] Reinsurance is a business undertaking pursuant to a reinsurance contract, in which an insurer transfers or "cedes" to another insurer, known as the "reinsurer," a portion of the ceding insurer's risks flowing from insurance policies written by the insurer for policyholders. In a reinsurance agreement, the reinsurer agrees to indemnify the ceding insurer in return for payment of a portion of the ceding insurer's premiums. When a valid claim is made, the insurance company pays the claim and the reinsurance company reimburses the insurance company to the extent required by the reinsurance agreement.

[3] Signet Star changed its name to Berkley Insurance Company on or about December 31, 2000.

losses under the program in exchange for a correspond-
ing quota share (ten percent) of the premiums that
Signet Star collected." (Internal quotation marks omit-
ted.) As part of SCARF II, the plaintiff also "agreed to
accept a 20 [percent] participation of the employer's
liability [for the workers' compensation claims] part of
the program."

On or about September 3, 2004, the plaintiff and the
defendant entered into a commutation and release
agreement (commutation agreement).[4] By its terms, the
commutation agreement referred to the plaintiff as the
"Reinsurer" and the defendant, its subsidiaries and affil-
iates collectively were referred to as the "Company."
The commutation agreement's stated purpose was to
"fully and finally terminate, release, determine and fully
and finally settle, commute and extinguish all [the par-
ties'] respective past, present, and future obligations
and liabilities, known and unknown, fixed and contin-
gent, under, arising out of, and/or pursuant to the [r]ein-
surance [a]greements . . . ."

The commutation agreement defined "reinsurance
agreement" in the following paragraph: "Whereas, the
[p]arties have entered various reinsurance agreements
pursuant to which the Reinsurer reinsured certain liabil-
ities of the Company and/or the Company reinsured
certain liabilities of the Reinsurer (such agreements
and all other agreements entered into in connection
or relating to such agreements are referred to herein
collectively as the [r]einsurance [a]greements) . . . ."

---

[4] As noted by the trial court regarding commutation agreements generally:
"Commutation is an agreement between the parties bringing to an end the
liabilities of the reinsurer under the contract, usually a treaty, although
possibly a long-term facultative contract. In its simplest form, a lump sum
payment by the reinsurer is substituted for the unknown future liabilities
on ceded risks and it is done for reasons on both sides having to do with
the relative advantages of current and long-term money or the convenience
of closing certain yearly accounts. G. Staring, Law of Reinsurance (1993)
§ 14:6." (Internal quotation marks omitted.)

The commutation agreement required the plaintiff to make a payment of $15,248,338 to the defendant "in full satisfaction of the Reinsurer's past, present and future net liability under the [r]einsurance [a]greements . . . ."

The commutation agreement further stated that "[t]his [a]greement sets forth the entire [a]greement between the [p]arties with respect to the subject matter hereof and supersedes all prior agreements or understandings between them pertaining to the subject matter hereof." In addition, the commutation agreement stated: "This [a]greement may not be amended, altered, supplemented or modified, except by written agreement signed by the [p]arties." Also, the commutation agreement provided that each party "represents to the other as follows: (a) it has had full opportunity to consult with its respective attorneys in connection with the negotiation and drafting of this [a]greement; (b) it has carefully read and understands the scope and effect of each provision contained in this [a]greement; (c) it has conducted all necessary due diligence, investigation and analysis of the transactions contemplated by this [a]greement; and (d) it is not relying upon any representations made by any other party, its attorneys or other representatives."

Following the execution of the commutation agreement, from September 3, 2004 until approximately June, 2008, the plaintiff continued to make payments pursuant to SCARF II.[5] Likewise, during that time, the defendant continued to make premium payments to the plaintiff, totaling approximately $56,000. Between 2006 and 2008, however, the plaintiff began falling behind on its SCARF II payments and the SCARF II administrator began pressing the plaintiff for the past due payments.

[5] The plaintiff contends that it paid the third party administrator of SCARF II a net total of $451,006.72 after entering into the commutation agreement.

At the time, the plaintiff assured the SCARF II administrator that it would be making back payments and advised the administrator that it intended to initiate discussions with the defendant regarding commutation of its obligations under SCARF II.

In January, 2008, Stephen Eisenmann became an executive vice president and officer of the plaintiff. In that capacity, he had the opportunity to review the commutation agreement. On the basis of his review of the commutation agreement, Eisenmann concluded that it commuted SCARF II and therefore the plaintiff had no obligation to make payments to the defendant pursuant to SCARF II after the commutation agreement went into effect on September 3, 2004. Eisenmann determined that, based on the commutation agreement's language, the agreement was global, thereby commuting all reinsurance agreements between the plaintiff and the defendant, including SCARF II, as of the effective date of the commutation agreement. As a result, the plaintiff stopped making further payments under SCARF II and sought a return of the sum of $451,006.72, an amount it believed it had unnecessarily paid to the defendant pursuant to SCARF II. The defendant disagreed with Eisenmann's conclusion that the commutation agreement commuted SCARF II and that the money paid following the execution of the commutation agreement should be returned.

Thereafter, the plaintiff instituted an action seeking a declaration that the commutation agreement commuted SCARF II. In count one, the plaintiff sought a declaratory judgment that the commutation agreement discharged its obligations under SCARF II. The second count, which sounded in unjust enrichment, alleged that the plaintiff was entitled to a return of the money it paid under SCARF II following the execution of the commutation agreement. Following a bench trial, the court held as to count one that the commutation

agreement did, in fact, commute SCARF II. As to count two, the court held that the restitution sought by the plaintiff was barred pursuant to the voluntary payment doctrine.

Having prevailed at trial on its declaratory judgment action, on May 2, 2011, the plaintiff filed a motion for attorney's fees pursuant to Practice Book § 11-21 and article 11, § (h) of the commutation agreement.[6] The court denied that motion, stating that "[t]here has been no judicial determination that the defendant was in breach of the commutation agreement, which alleged breach is the basis for the [plaintiff's] claim for attorney's fees." This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly determined that there was no mutual mistake regarding the inclusion of SCARF II in the commutation agreement.[7] More specifically, the defendant claims that the court should have determined that a mutual mistake existed and, therefore, the court should have reformed the contract to reflect the true intent of the parties: that

---

[6] Article 11, § (h) of the commutation agreement provides: "In the event of any breach of the terms or conditions of this [a]greement, the party prevailing at trial shall be entitled to recover from the breaching party, all costs and expenses, including, without limitation, reasonable attorneys fees and disbursements."

[7] Collateral to this argument, the defendant claims that the court improperly refused to consider extrinsic evidence in its determination of the presence of a mutual mistake. Although it is true, as the defendant contends, that our courts have held that extrinsic evidence may be admissible to show mistake; see *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 503 n.14, 746 A.2d 1277 (2000); there is no requirement that the court consider such evidence. Furthermore, the court in this case did in fact acknowledge numerous items of extrinsic evidence in support of its factual finding. At no point in its opinion did the court explicitly state that it refused to consider a particular piece of extrinsic evidence, as the defendant claims.

SCARF II was to be excluded from the commutation agreement. We disagree.

Connecticut law on the subject of reformation of a contract was summarized succinctly by our Supreme Court in *Greenwich Contracting Co.* v. *Bonwit Construction Co.*, 156 Conn. 123, 126–27, 239 A.2d 519 (1968): "A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other. . . . A court in the exercise of its power to reform a contract must act with the utmost caution and can only grant the relief requested if the prayer for reformation is supported by convincing evidence. . . . [In finding mutual mistake] it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be clear so as to leave no room for doubt. . . . If the right to reformation is grounded solely on mistake, it is required that the mistake be mutual, and to prevail in such a case, it must appear that the writing, as reformed, will express what was understood and agreed to by both parties." (Citations omitted.)

"Whether there has been such mistake is a question of fact. . . . Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its

findings." (Citations omitted; internal quotation marks omitted.) *McBurney* v. *Cirillo*, 276 Conn. 782, 815–16, 889 A.2d 759 (2006), overruled in part on other grounds by *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 284–89, 914 A.2d 996 (2007).

In seeking to reverse the judgment of the court, the defendant concedes the difficulty inherent in demonstrating reversible error as to a trial judge's finding of fact. Despite the highly deferential standard that governs such claims, however, the defendant nevertheless argues that the cumulative effect of the evidence compels the logical conclusion that the parties intended to exclude SCARF II from the commutation agreement. Our review of the record does not support this conclusion. Rather, the record reveals evidence in support of the court's findings of fact, which in turn support the conclusions of the court. Therefore, we are not left with the definite and firm conviction that the court improperly found that there was no mutual mistake.[8]

More specifically, the contract was drafted and signed by an officer of the defendant who was experienced in such matters. In fact, in the commutation agreement itself the defendant affirmatively represented that it had read and understood the commutation agreement and that it was not relying on any representations outside of the contract. The draft of the commutation agreement was also reviewed multiple times by various employees of the defendant, including two attorneys who represented the defendant in the drafting of the commutation agreement. The review process

---

[8] We acknowledge that there may be evidence to support the defendant's contention that the intention of the parties was to exclude SCARF II from the commutation agreement. When reviewing the findings of the trial court under a clearly erroneous standard, however, we need not determine that its decision was the only possible outcome, but only that there is sufficient evidence to support its conclusion. Weighing conflicting evidence is within the exclusive province of the trial court; it is not an appellate function.

yielded a number of suggestions and ultimately all those who participated deemed the agreement to be acceptable.[9] In addition, the commutation agreement states in multiple places that it fully and finally terminates all of the parties' reinsurance relationships. Indeed, William P. Scott, the defendant's vice president of financial risk management, testified that the proposal did not exclude SCARF II. In an e-mail sent by Scott to other employees following the acceptance of the commutation agreement, the defendant represented that it had agreed to a global settlement amount for the defendant's ceded business. Finally, there is nothing in the record which required the court to interpret the language of the contract contrary to the common sense meaning of the words used, as the terms of the commutation agreement clearly support the court's finding. Accordingly, it cannot be said that the court's finding regarding the intent or understanding of the parties was clearly erroneous.

## II

The defendant additionally claims that the term "reinsurance agreements," as used in the commutation agreement, is ambiguous and that the court, therefore, should have considered extrinsic evidence which would have led to the conclusion that the term does not include the plaintiff's obligations under SCARF II. We are not persuaded.

Because a determination as to whether a contract is ambiguous is a question of law, our review is plenary. *Electric Cable Compounds, Inc.* v. *Seymour*, 95 Conn. App. 523, 529, 897 A.2d 146 (2006). "A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . [T]he mere fact that the

---

[9] Bruce Weiser, one of the attorneys representing the defendant in the drafting of the commutation agreement, testified that he revised and/or removed any language that he felt was "objectionable," "unclear" or "ambiguous."

parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 735, 873 A.2d 898 (2005). Thus, the question before us is whether the language at issue is susceptible to more than one reasonable interpretation, rather than merely a conceivable one. See, e.g., *Isham* v. *Isham*, 292 Conn. 170, 181, 972 A.2d 228 (2009) ("proper inquiry focuses on whether the agreement on its face is reasonably susceptible of more than one interpretation"); *Poole* v. *Waterbury*, 266 Conn. 68, 88, 831 A.2d 211 (2003) (contract ambiguous if language of contract is susceptible to more than one reasonable interpretation).

As with any issue of contract interpretation, we look first to the language of the contract. The commutation agreement defines reinsurance agreements as "agreements pursuant to which the Reinsurer reinsured certain liabilities of the Company and/or the Company reinsured certain liabilities of the Reinsurer (such agreements and all other agreements entered into in connection or relating to such agreements are referred to herein collectively as the 'Reinsurance Agreements')."

The defendant claims that there is evidence to support the contention that SCARF II is a pool or facility

comprised of numerous contracts, including reinsurance agreements, among several participating reinsurers in addition to the plaintiff and the defendant as well as the participation of third party underwriters, managers and administrators. Therefore, the defendant claims, because the commutation agreement referred to reinsurance agreements, and not to pools or facilities such as SCARF II, the language of the contract does not make it clear that the commutation agreement pertained to SCARF II. This lack of clarity, according to the defendant, creates an ambiguity as to purpose and scope of the commutation agreement.

In our view, the defendant's interpretation is not a reasonable one. As the court stated, reinsurance is defined as "[i]nsurance of all or part of one insurer's risk [the defendant] by a second insurer, [the plaintiff] who accepts this risk in exchange for a percentage [10 percent of 60 percent] of the original premium." (Internal quotation marks omitted.) It is clear from the provisions of SCARF II that it falls squarely within the ambit of this definition of reinsurance. Accordingly, we conclude that the commutation agreement is not ambiguous. We turn next to the issues raised by the plaintiff's cross appeal.

### III

On cross appeal, the plaintiff claims that the court improperly concluded that the plaintiff was not entitled to restitution. We disagree.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case

where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Citations omitted; internal quotation marks omitted.) *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282–83, 649 A.2d 518 (1994). It is the plaintiff's burden to prove the elements of a claim of unjust enrichment, including that the defendant was benefited. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 451–52, 970 A.2d 592 (2009).

"[T]he determinations of whether . . . particular [facts constitute the elements of unjust enrichment] are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *Ayotte Bros. Construction Co.* v. *Finney*, 42 Conn. App. 578, 581, 680 A.2d 330 (1996). Finally, unjust enrichment results when "it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff." (Internal quotation marks omitted.) *National CSS, Inc.* v. *Stamford*, 195 Conn. 587, 597, 489 A.2d 1034 (1985); see also *Pokorny* v. *Getta's Garage*, 219 Conn. 439, 462, 594 A.2d 446 (1991).

We begin our analysis with a discussion of *Northrop* v. *Graves*, 19 Conn. 548 (1849), which anchors the law of restitution in Connecticut. In *Northrop*, the executors of an estate mistakenly believed that they were bound to pay $500 to the daughter of the decedent when in fact the decedent's will required that they pay the daughter's children. The jury awarded restitution to the executors. In affirming, our Supreme Court made clear that "[w]e do not decide that money paid by a mere mistake in point of law, can be recovered back," but instead articulated a theory of restitution grounded in equity and conscience. Id., 554. "[W]e mean distinctly to assert, that, when money is paid by one, under a mistake of his rights and his duty, and which he was under no legal or moral obligation to pay, and which the recipient has no right in good conscience to retain, it may be recovered . . . ." Id. The court explained that a restitution claim is essentially an equitable action, and noted cases in which courts had declined to award restitution because, although funds were paid as a result of mistake, the payees received them in good conscience. Id., 555–57. Distinguishing the facts in the case before it, our Supreme Court stressed that the executors "verily supposed they were bound to pay, and the defendant, at the same time, knew they were not . . . ." Id., 555. The court therefore determined that "the money in good conscience as much belongs to the plaintiffs now, as it did when they had it in [their] possession . . . ." Id. The court further stated that "[i]t is therefore a rule, that money paid with full knowledge of facts, but through ignorance of the law, is not recoverable, if there be nothing unconscientious in the retainer of it . . . ." (Internal quotation marks omitted.) Id., 558.

In *Rockwell* v. *New Departure Mfg. Co.*, 102 Conn. 255, 128 A. 302 (1925), our Supreme Court further articulated the circumstances in which restitution may or may not be appropriate based on a mistake of law.

There, the plaintiff entered into a contract with his employer under which he received, among other things, commissions on royalties from the sale of goods using his inventions; the contract entitled the plaintiff to commissions relating to double row bearings. From 1911 to 1917, the employer paid these commissions, however, the employer also paid commissions relating to sales of single row bearings which were not invented by the plaintiff. The company's mistake resulted from its failure to read the contract closely to determine the plaintiff's rights with respect to his commission on the sale of bearings. The trial court presiding over the parties' contract dispute ordered that the plaintiff pay back the royalties on the single row bearings. Our Supreme Court reversed, noting that "the parties stood on an equal footing, each having access to his own copy of the written contract, upon the true interpretation of which the existence of a debatable legal obligation depended." Id., 307. The court further stated that the defendant's mistake did not "make the payments in question any the less voluntary in character, or impose upon the plaintiff, who made his claim in good faith and still pursues it in good faith, any equitable obligation to refund the payments." Id.

The trial court in the present case stated that *Rockwell* carved out an exception where voluntary payments made in error did not have to be repaid. Although we agree with the court that the reasoning of *Rockwell* warrants the conclusion that restitution premised on unjust enrichment is not appropriate in this situation, we do not believe that the court, in *Rockwell*, created an exception to prior law regarding restitution. Rather, we believe that the court in *Rockwell* simply emphasized that circumstantial equities play a significant role in determining whether restitution is proper when it is sought pursuant to a claim of unjust enrichment. The court noted: "[W]e do not question or weaken the

authority of *Northrop* v. *Graves*, [supra, 19 Conn. 548], and our many other decisions holding that money paid under a mistake of fact or of law, which the recipient has no right in good conscience to retain, may be recovered back. We do hold that when the parties to a written contract stand on an equal footing as to means of knowledge of their contract obligations, money paid by one to the other, in part performance of the contract, in response to a claim made in good faith and based upon a permissible but erroneous construction of the contract, cannot be recovered back as money paid under a mistake of law." *Rockwell* v. *New Departure Mfg. Co.*, supra, 102 Conn. 307–308. It is clear from this language that the court in *Rockwell* drew a distinction between the conduct and behavior of the payee in the case before it and the contrasting facts in *Northrop*. *Rockwell* dealt with a payee who had the same good faith, but erroneous understanding of the contract as the payor who paid him whereas *Northrop* dealt with a payee who knew he was not due the money he had received and whose performance did not entitle him to payment even though the payors believed they had an obligation to make payment.

As discussed previously, the court here found that prior to the plaintiff's realization that its obligations under SCARF II were relieved by the commutation agreement, it accepted premium payments from the defendant. In like manner, the plaintiff paid policy claims to the administrator of SCARF II, which were then remitted to the defendant's subsidiary, Signet Star. Thus, both parties were carrying out their obligations pursuant to the agreement as they understood them and the benefits bargained for by one party were in direct proportion to the benefit conferred on the other, as contemplated in SCARF II. For four years, the plaintiff and the defendant erroneously, but in good faith, believed that the obligations of SCARF II remained in

effect notwithstanding the commutation agreement, and, during that time period, both parties performed their respective obligations and conferred anticipated benefits on each other, as they believed them to be. Accordingly, there was no evidentiary foundation for the court to have determined that one party had been unjustly enriched at the expense of the other. On that basis, we agree with the trial court's conclusion that restitution was not appropriate.

IV

Finally, we consider the plaintiff's cross appeal regarding attorney's fees. The plaintiff argues that the court improperly refused to consider whether the defendant breached the commutation agreement and, if so, whether that breach satisfied article 11, § (h) of the commutation agreement, which provided for the payment of attorney's fees. We are not persuaded.

In general, the "rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . This rule is generally followed throughout the country. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorney's fees and costs . . . ." (Internal quotation marks omitted.) *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 582, 923 A.2d 697 (2007).

The relevant contract provision in the present case contemplated an order for the payment of counsel fees upon a finding that the contract has been breached, a finding not made in this instance. The commutation agreement, article 11, § (h),[10] permits a party to recoup attorney's fees only if it prevails at trial on a breach of

---

[10] See footnote 6 of this opinion.

contract claim. The plaintiff, however, neither asserted nor prevailed on a breach of contract claim and therefore it had no right to attorney's fees. It is well established that "the right of a plaintiff to recover is limited by the allegations of the complaint . . . and any judgment should conform to the pleadings, the issues and the prayers for relief." (Internal quotation marks omitted.) *David Caron Chrysler Motors, LLC* v. *Goodhall's, Inc.*, 304 Conn. 738, 744, 43 A.3d 164 (2012). Put simply, "[a] plaintiff may not allege one cause of action and recover upon another." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 63, 717 A.2d 77 (1998). Accordingly, the court correctly denied the plaintiff's motion for attorney's fees.

The judgment is affirmed.

In this opinion the other judges concurred.